Clayton LIBBY, Petitioner, Appellant,

v.

Ronald DUVAL and Scott Harshbarger, Respondents, Appellees.

No. 93–1588.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1993.

Decided March 24, 1994.

---

734

Patricia A. O'Neill, Boston, MA, for appellant.

Elisabeth J. Medvedow, Assistant Attorney General, with whom Scott Harshbarger, Attorney General, Boston, MA, was on brief for appellees.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

In this appeal, Clayton Libby, a Massachusetts state prisoner serving a life sentence on a 1971 conviction for murder in the first degree, challenges the district court's denial of his petition for a writ of habeas corpus. In so doing, petitioner primarily contends that the court erred in deeming harmless a jury instruction on the issue of malice which set up an unconstitutional mandatory presumption. See Sandstrom v. Montana, 442 U.S. 510, 520–24, 99 S.Ct. 2450, 2451–59, 61 L.Ed.2d 39 (1979) (instruction containing presumption which has the effect of relieving the prosecution of the burden of proof on an element of a charged crime violates the Due Process Clause) (hereinafter "Sandstrom error").[1] We affirm.

---

1. Petitioner also argues that an instruction on manslaughter given at this trial effectuated an unconstitutional shift in the burden of proof. As we will explain more fully infra in discussing the effects of the presumption-creating instruction, we do not believe it at all likely that the jury would have returned a verdict of manslaughter even if it had been perfectly instructed. We, therefore, regard any error in the manslaughter

## I.

### BACKGROUND

Early in the morning of August 9, 1970, Bruce Cullen, a New Hampshire resident, was stabbed to death in a brawl that erupted outside of a South Boston housing project. Petitioner and George Cooper were indicted and tried for the killing. Cooper was acquitted; Libby, however, was convicted of murder in the first degree.

Although the circumstances in which the stabbing took place are sketchy, the trial record reveals that, on the night of August 8, 1970, petitioner was drinking beer, smoking marijuana, and possibly taking diet pills. Sometime early in the morning of August 9, 1970, petitioner, along with Francis Barton and Kevin Martin, went to George Cooper's South Boston apartment building and began to converse with Cooper through a rear apartment window. After a while, petitioner and Martin walked to the front of the building where they met several other men. Included among these men were the victim, Cullen, and another New Hampshire resident, Dennis Bates.

At some point, a fight broke out. The reason for the fight is not entirely clear, although there was testimony indicating that it started simply because Cullen and Bates were not from the area. There also was testimony indicating that petitioner and Cullen were arguing about whether Cullen had been in a certain federal prison. In any event, during the course of the fight, Cullen was stabbed nine times. Six of the stab wounds were to his chest; the other three were to his back or side. One of the chest wounds was to the victim's heart, and apparently was delivered by a "downward" blow.

No witness testified to actually observing the stabbing.[2] Instead, petitioner was incul-

---

instruction as harmless and confine our discussion to petitioner's claim under Sandstrom.

2. One witness, Mary VanGordon, who lived in a neighboring apartment, did testify to seeing Cooper hold the victim while a short, stocky man with dark hair (a description that did not fit petitioner) thrust an object towards Cullen's stomach five times. VanGordon further testified that, after the attack, Cooper ran into the hallway

pated through the testimony of eyewitnesses who observed him both before and after the fight. Specifically, there was testimony that, *inter alia*, petitioner (1) had been carrying a knife prior to the fight; (2) was seen running away from the site of the fight with blood on his clothes; (3) was seen holding a knife shortly after the stabbing; (4) admitted, on several occasions after the fight, that he had done the stabbing; and (5) made threats against anyone who might "snitch[ ] on him." There also was testimony that petitioner had stabbed Cullen because he thought Cullen was "going to jump him from behind" and/or because he thought Cullen was "beating up Kevin Martin."

At the conclusion of a seven-day jury trial, the trial judge instructed the jury on theories of first degree murder,[3] second degree murder, and manslaughter. In the course of defining malice, which is "the requisite mental element" of murder under Massachusetts law, *see Commonwealth v. Huot*, 380 Mass. 403, 403 N.E.2d 411, 414 (1980), *overruled on other grounds, Commonwealth v. Bray*, 407 Mass. 296, 553 N.E.2d 538 (1990),[4] the judge told the jury that "[m]alice is implied in

every deliberate cruel act by one against another." The jury convicted petitioner of first degree murder and recommended a sentence of life imprisonment.

On appeal, petitioner argued, *inter alia*, that the aforementioned instruction constituted *Sandstrom* error and required reversal of his conviction.[5] More particularly, petitioner asserted that the instruction had the effect of directing the jury to find malice if it found that petitioner had committed a "deliberate cruel" act against the victim despite the fact that a "deliberate cruel" act is not necessarily malicious. The SJC disagreed, holding: "In the context of the facts of this case and in light of the judge's entire instruction on malice (which is not otherwise challenged), we see neither a substantial likelihood of a miscarriage of justice calling for relief ... nor an unconstitutional presumption dictated to the jury." *Commonwealth v. Libby*, 405 Mass. 231, 540 N.E.2d 154, 158 (1989) (hereinafter *"Libby I"*). The SJC then went on to affirm the conviction, although it remanded to the superior court for consideration of a previously-filed motion to dismiss the indictment on account of delay.

of a nearby building while the man who had thrust the object towards Cullen's stomach ran around to the back of the same building.

3. The trial court instructed the jury that it could convict for first degree murder if it determined, after other requisite findings, that the stabbing had been either deliberately premeditated or had been committed with extreme atrocity or cruelty. A review of the trial record, however, reveals that the prosecution relied exclusively on the extreme atrocity or cruelty theory in arguing that first degree murder had been committed.

4. Unlawful killings committed without malice are considered manslaughter. *See Commonwealth v. Todd*, 480 Mass. 724, 563 N.E.2d 211, 214 (1990).

5. *Sandstrom* was not decided until eight years after petitioner's conviction. However, because petitioner's direct appeal was not perfected until nearly eighteen years after his conviction, *see Commonwealth v. Libby*, 411 Mass. 177, 580 N.E.2d 1025, 1026–27 (1991) (hereinafter *"Libby II"*) (explaining the neglect by court-appointed counsel, the clerk's office, and the prosecutor's office which led to the delay in perfecting petitioner's appeal), and because new rules announced in Supreme Court decisions apply to all criminal cases "pending on direct review or not yet final," *Griffith v. Kentucky*, 479 U.S. 314, 328,

107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), both the Massachusetts Supreme Judicial Court ("SJC"), at least in *Libby II*, and the district court treated petitioner's *Sandstrom* argument as properly raised on direct appellate review. We will do likewise.

Similarly, although petitioner did not object to the challenged instruction at the time it was given, Massachusetts has waived its contemporaneous objection rule in the *Sandstrom* error context where the error occurred prior to the *Sandstrom* decision. *See, e.g., Commonwealth v. Hill*, 387 Mass. 619, 442 N.E.2d 24, 28 n. 9 (1982), *vacated and remanded on other grounds, Hill v. Maloney*, 927 F.2d 646 (1st Cir.1990). Because this condition is met, petitioner's failure to object at trial does not procedurally bar us, *see Wainwright v. Sykes*, 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977) (failure to object at trial as required by a state contemporaneous objection rule constitutes "independent and adequate ground" sufficient to foreclose federal habeas review of alleged error), from reaching the merits of his argument in this instance, *cf. Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir.1987) (indicating that waiver of state contemporaneous objection rule removes procedural bar that ordinarily would preclude habeas court from reaching claim on merits where there was no objection at trial), *cert. denied*, 485 U.S. 990, 108 S.Ct. 1297, 99 L.Ed.2d 506 (1988).

In August 1990, petitioner's motion to dismiss was denied by the superior court. In September 1990, petitioner filed a timely notice of appeal from this denial. While that appeal was pending, this court handed down its decision in *Hill v. Maloney*, 927 F.2d 646 (1st Cir.1990). *See supra* note 5. In *Hill*, we held unconstitutional a jury instruction quite similar to the one here at issue. *Id.* at 649–51.[6] Relying on *Hill*, petitioner argued for a second time to the SJC that his conviction should be set aside because the trial judge's instruction had the effect of setting up an unconstitutional mandatory presumption. Once again, the SJC rejected petitioner's argument and affirmed his conviction. *See Libby II*, 580 N.E.2d at 1028.

Finally, petitioner sought relief in the district court by means of a writ of habeas corpus. In a comprehensive memorandum and order, the court applied the three-part test set forth in *Hill* for review of alleged *Sandstrom* errors and denied the writ. First, the court determined that the challenged instruction set up an unconstitutional mandatory presumption and therefore constituted *Sandstrom* error. *See Libby v. Duval*, No. 86–2187–WD, slip op. at 8–9 (D.Mass. April 20, 1993) (hereinafter "*Libby III*"); *see also Hill*, 927 F.2d at 648–49. Next, the court found that the instructions as a whole did not sufficiently explain the erroneous instruction on malice, and the jury therefore was not properly instructed on the law. *See Libby III*, slip op. at 10–13; *see also Hill*, 927 F.2d at 649. Finally, the court concluded that the instruction, although erroneous, was harmless beyond a reasonable doubt. *See Libby III*, slip op. at 13–19; *see also Hill*, 927 F.2d at 649. It is from this last conclusion that petitioner appeals.

## II.

### DISCUSSION

We agree with the district court that the tripartite *Hill* test applies to the merits of petitioner's claim. Accordingly, we organize our discussion within the *Hill* framework.

### A.

■ Because the *Hill* opinion rehearses in great detail the legal standards applicable to challenges to jury instructions which set up presumptions, and because respondents[7] concede that the instruction challenged here established a mandatory presumption, we do not believe that either a highly detailed discussion of the law of presumptions or an extensive explanation of why the instruction was defective is required.[8] Instead, we think it sufficient to note our belief that it was reasonably likely that the jurors construed the trial judge's instruction as requiring a finding of malice upon a finding that the stabbing was "deliberate" and "cruel." *See Estelle v. McGuire*, —— U.S. ——, ——, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (habeas challenges to jury instructions reviewed for "reasonable likelihood" that the jury has applied the challenged instruction in an unconstitutional manner). Thus, because the instruction had the effect of relieving the prosecution of the burden of proof on an element of the crime charged, *see Sandstrom*, 442 U.S. at 520–24, 99 S.Ct. at 2457–59, the district court's conclusion that the instruction established a mandatory presumption was clearly correct. Accordingly, we move to step two of the *Hill* test.

### B.

Once we have determined that the specific language challenged by a petitioner set up a mandatory presumption, we consider whether other parts of the instruction explained the particular infirm language to the extent that there is no reasonable likelihood that the jurors applied the unconstitutional presumption. *See Boyde v. California*, 494 U.S. 370,

---

6. In *Hill*, the jury was instructed that "malice is implied from any deliberate *or* cruel act against another, however sudden." *Id.* at 648 (emphasis added).

7. Respondents in this matter are Ronald Duval, the Superintendent of the Massachusetts Correctional Institution at Cedar Junction, where re-

spondent is being detained, and Scott Harshbarger, the Attorney General of the Commonwealth of Massachusetts.

8. Readers interested in such a discussion should review both the *Hill* decision and the Supreme Court's decision in *Yates v. Evatt*, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).

380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). General instructions regarding the presumption of innocence and the government's burden of proving all elements of a crime beyond a reasonable doubt are insufficient to fulfill this explanatory role. *Id.* at 651.[9] So too are instructions directly contrary to the erroneous one which themselves correctly state the law. *Id.*[10] Instead, there must be other language in the instructions which actually *"explains* the infirm language sufficiently so that there is no reasonable likelihood that the jury believed it must [in the context of an erroneous malice instruction] find malice if it found petitioner [acted in such a way so as to trigger the unconstitutional presumption]." *Id.*

Respondents contend that four sections of the instructions, when taken together, sufficiently explain the infirm language. After reviewing these four sections, and after further reviewing the instructions as a whole, we cannot agree.

█ The first two sections adduced by respondents involve definitions of malice given prior to the unconstitutional instruction.[11] In each of these two instances, the trial judge correctly instructed the jurors that malice was not proved where, among other things, there were "extenuating circumstances" sufficient to "reduce the crime to manslaugh-

ter." At most, we think that these two definitions of malice *might* have allowed the jurors to infer that the presumption set up by the subsequent unconstitutional charge could be rebutted in certain extenuating circumstances. *Cf. id.* at 653. We do not, however, see how these definitions could have *explained* to the jurors that the upcoming instruction was not going to mean what it actually and clearly stated. At any rate, we reiterate that correct instructions, which directly contradict the erroneous instruction, are not sufficient to cure the error. *See supra* at p. 737 and note 10.

█ The other two sections cited by respondents are less compelling. The first of these two, which again preceded the infirm instruction, primarily defined the terms "aforethought" and "murder."[12] The second defined the term "premeditated."[13] Both of the passages are jumbled and confusing, especially when compared to the short and relatively straightforward statement which set up the unconstitutional mandatory presumption. *Cf. Hill,* 927 F.2d at 652 (juxtaposing clumsily-worded correct instruction with clear and concise unconstitutional instruction in deciding that correct portions of charge as a whole did not negate the effects of the presumption-creating language). Moreover, neither passage explicitly touched

9. This is because " '[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to [malice] could be satisfied.' " *Id.* (quoting *Sandstrom,* 442 U.S. at 518–19 n. 7, 99 S.Ct. at 2456 n. 7) (alteration in original).

10. This is because " '[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.' " *Id.* (quoting *Franklin,* 471 U.S. at 322, 105 S.Ct. at 1975) (alteration in original).

11. The first passage relied upon by respondents reads as follows: "[M]urder is the killing of a human being without legal justification or without excuse or without such extenuating circumstances as may reduce the crime to manslaughter; but with what is called in the law, malice aforethought."

The second passage is very similar: "Any intentional killing of a human being without legal justification or excuse and with no extenuating circumstances, sufficient in law to reduce the crime to manslaughter, is malicious."

12. In its entirety, this section reads:

If the wicked intent to do injury to another person precedes the act by which the injury was done, it is malice aforethought. If the homicide is committed without legal justification or that is to say, without due authority of law and not in self defense, and there is no issue here of self defense, nor in the heat of passion on great provocation, but with the specific intent to take the one killed, or an unlawful act, the natural consequence of which would be to deprive another person of life, it is murder.

13. This passage states:

Because it was a cruel act of the will and unlike an intent stimulated by a sudden anger or quarrel where someone suddenly, not having intended violence beforehand, does. It must have been a design actually formed and formed upon before the act and the murder must have been committed pursuant to design or plan that has thus been formed.

on the concept of malice, except insofar as the first one briefly discussed the "afore-thought" component of the term "malice aforethought." In light of these deficiencies, we do not see how these passages could have actually explained the challenged instruction "so as to offset any erroneous impression given by [it]." *See id.* at 651.

Before concluding our analysis of the entire charge, we pause to note that, because it was framed in irrefutable and unvarying terms ("[m]alice *is* implied in *every* deliberate and cruel act by one against another"), we think it at least reasonably likely that the challenged instruction completely removed the element of malice from the case once the Commonwealth established that petitioner had acted deliberately and cruelly.[14] Therefore, in conducting our harmless-error analysis, we will regard the instruction as having erected a conclusive mandatory presumption. *See Hill,* 927 F.2d at 649 n. 3 (distinguishing between conclusive mandatory presumptions and rebuttable mandatory presumptions).

In sum, we agree with the district court that the charge as a whole did not neutralize the effect of the presumption-creating language. Accordingly, the effect of the instruction here was unconstitutional.

### C.

◾ Having determined that the overall charge did not adequately explain the challenged instruction, we still must ascertain whether the error was harmless. *See id.* at 654; *see also Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (reiterating that *Sandstrom* error is subject to harmless-error review). In *Hill,* because the Supreme Court had sent mixed signals regarding the proper harmless-error analysis to be employed where there has been a mandatory presumption, we applied two separate approaches. First, we looked at the trial record as a whole to determine whether it was clear "beyond a reasonable doubt" that the error was harm-

less. *See Hill,* 927 F.2d at 655 (applying the *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), standard for determining, on direct review, whether a conviction must be set aside because of federal constitutional error); *see also Rose v. Clark,* 478 U.S. 570, 580–82, 106 S.Ct. 3101, 3107–08, 92 L.Ed.2d 460 (1986) (applying *Chapman* harmless-error standard to a presumption-creating jury instruction challenged on habeas). Alternatively, we utilized a narrower approach, derived from *Chapman,* for analyzing the effects of a conclusive mandatory presumption urged by Justice Scalia in a concurring opinion in *Carella v. California,* 491 U.S. 263, 267–73, 109 S.Ct. 2419, 2421–24, 105 L.Ed.2d 218 (1989) (hereinafter the "*Carella* test"). *See Hill,* 927 F.2d at 654–56. Under both approaches we determined that the error was not harmless. *Id.* at 657.

Since the decision in *Hill,* however, (and since the district court passed on whether or not the presumption-creating instruction was harmless), the Supreme Court has issued *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which clarifies that the two approaches employed in *Hill* are no longer applicable on collateral review. In *Brecht,* the Supreme Court announced that the *Chapman* "harmless beyond a reasonable doubt" test should not be utilized by courts reviewing claims of constitutional error of the trial type on habeas, *id.* at ——, 113 S.Ct. at 1717; instead, reviewing courts should now look to whether error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

Petitioner contends that the *Brecht* approach is inappropriate in the conclusive presumption context. He therefore urges us to explicitly adopt the *Carella* test for determining whether or not an instruction creating such a presumption can be viewed as harmless error. In light of the clear and uncom-

---

14. We concede, as noted earlier, that the jurors *might* have inferred from the correct definitions of malice that the "implication" of malice created by deliberate and cruel acts was rebuttable. *See supra* at p. 737. Such a reading would, however, have been quite strained. In any case, we think it at least as likely that the jurors ignored the correct malice instructions which are facially irreconcilable with the challenged instruction. *See supra* note 10.

promising language employed by the Court in *Brecht*, we decline to do so.

The issue presented in *Brecht* was whether the prosecutor's use of petitioner's post-*Miranda* silence for impeachment purposes at petitioner's trial, which violated petitioner's due process rights under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (hereinafter "*Doyle* error"), was harmless. In concluding that it was, the majority decided, as we have noted, that the *Kotteakos* harmless-error standard was the appropriate lens through which to view the claim on habeas. *See Brecht*, —— U.S. at ——, 113 S.Ct. at 1722. In so doing, the Court departed from the approach taken in certain other habeas cases where it had assumed the applicability of the *Chapman* standard. *Id.* at ——, 113 S.Ct. at 1718 (citing *Yates v. Evatt*, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968) (per curiam)).

In conducting its analysis, the Court began by observing that *Doyle* error fit into the category of constitutional error known as "trial error." *See Brecht*, —— U.S. at ——, 113 S.Ct. at 1717. These are errors which " 'occur[ ] during the presentation of the case to the jury,' and [are] amenable to harmless error analysis because [they] 'may be quantitatively assessed in the context of other evidence presented in order to determine the effect [they] had on the trial.' " *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1263–64, 113 L.Ed.2d 302 (1991)). Errors of the trial type have, since *Chapman*, been reviewed under the "harmless-beyond-a-reasonable-doubt" standard.

The Court also noted that, at the other end of the spectrum of constitutional errors are " 'structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards' . . . because they infect the entire trial process." *Id.* (quoting *Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1264). Listed as an example of such a structural defect was deprivation of the right to counsel. *Id.* (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).

After reaching this conclusion, and determining that neither the doctrine of *stare decisis* nor congressional silence prevented it from considering the merits of respondent's argument that the *Kotteakos* standard, and not the *Chapman* standard, should be employed in determining whether the *Doyle* error was harmless, *see generally id.* —— U.S. at —— –——, 113 S.Ct. at 1718–19, the Court turned to an analysis of whether the *Chapman* standard appropriately served certain interests implicated in habeas cases but not in the direct review context whence it sprang. Pointing to (1) the state's interest in finality of convictions that have survived direct review within the state court system; (2) the interests of comity; (3) the interests of federalism; and (4) the interest of maintaining the prominence of the trial itself, the Court decided that application of the *Chapman* standard to trial errors challenged on habeas resulted in an "imbalance of . . . costs and benefits." *Id.* at ——, 113 S.Ct. at 1721. Accordingly, the Court embraced the less onerous *Kotteakos* standard, holding that it applies "in determining whether habeas relief must be granted because of constitutional error of the trial type." *Id.* at ——, 113 S.Ct. at 1722. Like the *Chapman* test, this "actual prejudice" inquiry presumes that the reviewing court will conduct its harmlessness assessment "in light of the record as a whole." *Id.*

After *Brecht*, we think it apparent that the question of whether to apply the *Kotteakos* test in conducting our harmless error inquiry turns on whether the conclusive presumption here at issue constitutes "trial error." Despite the force of some of our dissenting brother's arguments, we are constrained by the Supreme Court's teaching that it should be so considered. *See Arizona v. Fulminante*, 499 U.S. 279, 306–07, 111 S.Ct. 1246, 1261–62, 113 L.Ed.2d 302 (1990) (citing *Carella* ). Thus, we train our sights on whether, in light of the whole record, respondents have met their burden [15] of demonstrating

---

**15.** We acknowledge that the majority opinion in *Brecht* treats the burden as petitioner's. *See*

that the conclusive presumption did not actually prejudice petitioner because it did not have a substantial and injurious effect or influence in determining the jury's verdict. In our view, respondents have met their burden.

The thrust of petitioner's harmfulness claim is not that, in the absence of the conclusive presumption, he would have been acquitted. Rather, petitioner's argument is that the conclusive presumption precluded the jury from convicting him of manslaughter on a theory of "sudden combat." *See Commonwealth v. Richard*, 377 Mass. 64, 384 N.E.2d 636, 638 (1979) (the presence of sudden combat constitutes a mitigating circumstance sufficient to reduce a verdict of murder to manslaughter under Massachusetts law). While we concede (1) that there was evidence (*i.e.,* the testimony that petitioner stabbed Cullen because he thought Cullen was "going to jump him from behind" and/or because he thought Cullen was "beating up Kevin Martin") which *might* conceivably have provided a basis for the jury to have concluded that the government had not proved an absence of sudden combat; and (2) that the conclusive presumption tended to deter the jury from considering this evidence, *see Yates*, 500 U.S. at 406 n. 10, 111 S.Ct. at 1894 n. 10 (conclusive presumptions tend to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence), we think it extremely unlikely that the jury would have relied on this evidence and returned a verdict of manslaughter. Mary VanGordon testified that the stabbing was administered while the victim was being held by another man. Moreover, the evidence reveals that the victim was stabbed *nine* times, with six of the stab wounds being delivered to the chest area. In our view, such evidence, when combined with the fact that the defense never specifically argued a sudden combat theory to the jury,[16] strongly undermines any claim that petitioner was, throughout the entirety of the stabbing, acting in response to sudden combat.

We do not believe that the erroneous instruction had a substantial and injurious effect or influence on the jury's verdict. Accordingly, we affirm the district court's conclusion that the instructional error was harmless.[17]

***Affirmed.***

CYR, Circuit Judge (concurring):

Although I share my dissenting brother's belief that the *Carella* concurrence articulates compelling grounds for more narrowly confining "harmless error" review of a jury instruction mandating a conclusive presumption, I join the majority opinion because I am satisfied that the review required by the Court in *Brecht* encompasses the entire record.

Stahl, Circuit Judge, dissenting.

I agree with the majority that the instruction challenged here had the effect of setting up a conclusive presumption which was not explained away by the totality of the charge. I further agree with the majority that conclusive presumptions can constitute harmless error. However, I cannot agree with the method of harmless-error analysis employed by the majority and with its conclusion that the presumption-creating instruction was harmless. Accordingly, I respectfully dissent.

*Brecht*, —— U.S. at ——, 113 S.Ct. at 1722. Nonetheless, as Justice Stevens, who provided the crucial fifth vote in *Brecht*, convincingly explains in his concurring opinion, the *Kotteakos* test requires that the party arguing the harmlessness of an error which tends to prejudice a litigant's "substantial rights" (as all constitutional errors surely do) must bear the burden of proof. *Id.* at ——, 113 S.Ct. at 1723–24 and n. 1 (Stevens, J., concurring). Given this authority, and given the further fact that there appear to be five votes for this position and only four votes for placing the burden on petitioner, we will regard the burden of proof as resting upon the respondents.

16. It is clear from the record that petitioner focused his defense efforts on arguing that the prosecution did not establish beyond a reasonable doubt that he was, in fact, the stabber.

17. In so ruling, we express no opinion as to the district court's conclusion that the error here was harmless even under the *Chapman* standard.

### A.

In concluding that it is "extremely unlikely that the jury would have relied on [the unconsidered sudden combat] evidence and returned a verdict of manslaughter," *see ante* at 740, the majority significantly expands the contours of harmless-error analysis. For, implicit in this facially uncontroversial statement are two radical assumptions: (1) that, in the habeas context, reviewing courts now are obliged to supply missing factual findings; and (2) that, in the habeas context, reviewing courts can and should rely upon evidence that the jury did not consider. In my opinion, neither assumption can be squared with settled authority interpreting the Sixth Amendment jury-trial right and the Due Process Clause.

As the Supreme Court has made clear in a series of recent decisions, an instruction setting up a mandatory presumption engenders an error different in nature than the more typical form of constitutional error—improperly admitted evidence and/or improperly allowed argument. A mandatory presumption directs the jury to presume an element of the crime charged upon finding only certain predicate facts. *See, e.g., Sandstrom,* 442 U.S. at 517, 99 S.Ct. at 2455. This, of course, directly violates a criminal defendant's due process rights to have the prosecution prove all elements of the offense charged, *see Sullivan v. Louisiana,* — U.S. ——, ——, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993) (citing *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977) and *Leland v. Oregon,* 343 U.S. 790, 795, 72 S.Ct. 1002, 1005, 96 L.Ed. 1302 (1952)), and to have the prosecution persuade the factfinder beyond a reasonable doubt of the facts necessary to establish each of those elements, *id.* at ——, 113 S.Ct. at 2080–81 (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) and *Cool v. United States,* 409 U.S. 100, 104, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972) (per curiam)). It also, in my view, tends to undermine the Sixth Amendment jury-trial right. *See generally Carella,* 491 U.S. at 268–69, 109 S.Ct. at 2422 (Scalia, J., concurring); *cf. Sullivan,* — U.S. at ——, .113 S.Ct. at 2080 (discussing Sixth Amendment right to have the jury, and not the judge, make the requisite finding of guilt).

A *conclusive* mandatory presumption, as distinguished from a rebuttable mandatory presumption, has a further pernicious effect. By directing, without the possibility of rebuttal, the jury to find the elemental fact merely upon finding certain predicate facts, it "tend[s] to deter a jury from considering any evidence for the presumed fact beyond the predicate evidence." *Yates,* 500 U.S. at 406 n. 10, 111 S.Ct. at 1894 n. 10. Indeed, given the "sound presumption of appellate practice[ ] that jurors are reasonable and generally follow the instructions they are given," *id.* at 403, 111 S.Ct. at 1893, a reviewing court *must* assume that the jury did not consider evidence beyond that relating to the predicate facts, because "to do so would be a waste of the jury's time and contrary to its instructions," *id.* at 406 n. 10, 1894 n. 10; *see also Carella,* 491 U.S. at 269, 109 S.Ct. at 2422 (Scalia, J., concurring).

All of this is not to say that a conclusive presumption can never be harmless error. What it does mean, however, as Justice Scalia convincingly demonstrates in his concurrence in *Carella,* is that "the harmless-error analysis applicable in assessing a mandatory conclusive presumption is wholly unlike the typical form of such analysis." *Id.* at 267, 109 S.Ct. at 2421. Whereas it makes sense in the case of the more typical form of constitutional error—improperly admitted evidence and/or improperly allowed argument—to perform the type of whole-record "quantitative assessment" outlined in *Brecht* (and, incidentally, also outlined in *Chapman* ) in order "to determine whether the fact supported by [the] improperly admitted evidence [or improperly allowed argument] was in any event overwhelmingly established by other evidence," *see id.,* such an inquiry makes no sense where the error is not that the jury may have been swayed by tainted information, but rather is that the jury failed to consider relevant evidence and failed to make a required finding, *id.* at 267–69, 109 S.Ct. at 2421. For, as Justice Scalia explains:

> [Such] problem[s] would not be cured by an appellate court's determination that the record evidence unmistakably established

guilt, for that would represent a finding of fact by judges, not by a jury. As with a directed verdict [for the State, which is constitutionally impermissible, *see United States v. Martin Linen Supply Co.,* 430 U.S. 564, 572–73 [97 S.Ct. 1349, 1355, 51 L.Ed.2d 642] (1977) ], "the error in such a case is that the wrong entity judged the defendant guilty."

*Id.* at 269, 109 S.Ct. at 2422 (quoting *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)). Thus, the proper question for the reviewing court " 'is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials.' " *Id.* (quoting *Bollenbach v. United States,* 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946)).

With these principles in mind, Justice Scalia has proposed a test for determining whether, despite the presence of a conclusive presumption, a particular case presents a " 'rare situation[ ]' " where " '[a] reviewing court can be confident that [such a presumption] did not play any role in the jury's verdict.' " *Id.* 491 U.S. at 270, 109 S.Ct. at 2422 (quoting *Connecticut v. Johnson,* 460 U.S. 73, 87, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983) (plurality opinion)). Seeking to avoid the specter of factfinding by reviewing courts on the basis of evidence the jury never considered, the *Carella* test does not direct courts to ascertain whether the presumed fact was otherwise established to varying degrees by the evidence (as the *Brecht* and *Chapman* tests would do). Rather, the test instructs reviewing courts to ask (1) whether the instruction established a conclusive presumption on a charge which did not affect other charges and on which the defendant was acquitted; (2) whether the instruction established a conclusive presumption with respect to an element of the crime which the defendant admitted; or (3) whether

the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making

those findings [the] functional[ ] equivalent to ... the element required to be presumed.

*Id.* at 271, 109 S.Ct. at 2423. If the answer to any of these three questions is "yes," the error is harmless. *See id.* Because this test faithfully preserves a criminal defendant's Sixth and Fourteenth Amendment rights to have an impartial *jury* make the requisite factual and elemental determinations in his/her trial, and because it provides assurance that reviewing courts will consider only the evidence that the jury considered, I would apply this test rather than the ill-defined harmless-error test that the majority employs today.

### B.

Before applying the *Carella* test to this case, I feel it appropriate to respond to the arguments against the *Carella* test and in favor of the whole-record approach outlined in *Brecht.* Obviously, the most potent of these arguments is the one relied upon by the majority: that the whole-record *Brecht* analysis applies to "trial errors," that the Supreme Court, in a string citation in *Fulminante,* indicated that a conclusive presumption is "trial error," and that we therefore are obliged to conduct our harmlessness review in light of the whole record.

I will admit that the Court's characterization of a conclusive presumption as "trial error" in *Fulminante* is troublesome; indeed, I think this case well illustrates Justice White's criticism of the "trial error"/"structural error" dichotomy. *See Fulminante,* 499 U.S. at 291, 111 S.Ct. at 291 (White, J., dissenting in part) (arguing that, in assessing whether harmless-error analysis ought to be applied, courts should disregard the trial error/structural error distinction and instead "consider[ ] the nature of the right at issue and the effect of [the] error upon the trial"). Despite the aforementioned indication to the contrary, the presence of a non-harmless (as determined by the *Carella* test) conclusive presumption strikes me as a type of "structural error." *See Carella,* 491 U.S. at 268, 109 S.Ct. at 2419 (Scalia, J., concurring) ("The constitutional right to a jury trial embodies a profound judgment about the way in

which law should be enforced and justice administered. It is a *structural guarantee* that reflects a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.") (emphasis supplied) (citations and internal quotation marks omitted); *cf. Sullivan,* —— U.S. at ——, 113 S.Ct. at 2083 (denial of the right to a jury verdict of guilt beyond a reasonable doubt is a structural error).

In my view, however, whether we label a conclusive presumption trial error, structural error, or something in between is of no consequence; what matters instead is that we apply the appropriate form of harmless-error review in assessing the effects of that presumption. Applying a whole-record review not only ignores the considerations outlined in Part A. of this dissent, but it also ignores two indications by Supreme Court majorities, *subsequent* to *Fulminante,* that the *Carella* analysis is properly employed by courts reviewing presumptions. *See Sullivan,* —— U.S. at ——, 113 S.Ct. at 2082 (indicating, in the direct review context, that *Carella* provides the proper framework for determining whether or not a mandatory presumption was harmless); *Yates,* 500 U.S. at 406 n. 10, 111 S.Ct. at 1894 n. 10 (implicitly endorsing, in the habeas context, the *Carella* test as a means for evaluating whether or not a conclusive presumption was harmless). One might argue that *Yates* has been superseded by *Brecht,* and that *Brecht* did not control in *Sullivan* because *Sullivan* was a direct review case. In response, I would point out that *Chapman,* which did control in *Yates* and would have controlled in *Sullivan* had the error therein been deemed amenable to harmless-error review, contemplates a whole-record review every bit as much as *Brecht* does; nonetheless, the Court has made clear in the *Chapman* context that, when confronted with presumption error, the typical form of whole-record analysis does not apply. Thus, I read the string citation in *Fulminante* as merely indicating that a conclusive presumption is amenable to harmless-error review. I do *not* read it as stating that such a presumption is subject to the usual whole-record harmless-error test applicable to most other forms of trial error.

It might also be argued that the *Carella* test derives from *Chapman, see Carella,* 491 U.S. at 271, 109 S.Ct. at 2423 (Scalia, J., concurring) (noting that if the *Carella* test is met, "[t]he error is harmless because it is 'beyond a reasonable doubt' that the jury found the facts necessary to support the conviction") (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828), and that the replacement of *Chapman* with *Brecht* on habeas means that the *Carella* concurrence has no relevance in habeas cases. In response, I would concede that the *Carella* test *can be* theoretically viewed as "deriving from" *Chapman.* In my view, however, the *Carella* concurrence can just as easily and fairly be read as (1) explaining that a conclusive presumption sets up an error which tends to undermine a structural guarantee of the Constitution and which only can be harmless in those "rare" circumstances where the presumption did not play "any role" in the jury's verdict; (2) setting forth the test for determining whether the error played any such role; and (3) noting, in conclusion and without prior reference to *Chapman,* that when the *Carella* test is met, the *Chapman* test also is met. In light of this, and because abandoning *Carella* necessarily means that we must welcome factfinding by habeas courts on the basis of evidence the jury did not consider, I prefer the latter reading.

A third argument might be that, in *Yates,* the Supreme Court has already ratified factfinding by habeas courts. My response to such an argument simply would be that I agree. As I see it, the *Yates* test for reviewing the effects of rebuttable mandatory presumptions, which impermissibly shift the burden of proof from the prosecution to the defendant, does, despite the Supreme Court's indications to the contrary, reek of factfinding by reviewing courts. *Cf. generally Yates,* 500 U.S. at 411, 111 S.Ct. at 1898 (Scalia, J., concurring in judgment) (explaining that, when a jury has been directed to apply a rebuttable mandatory presumption, it has never found that the prosecution proved the element on which the presumption was erected beyond a reasonable doubt). However, as

Justice Scalia notes in his *Carella* concurrence:

> It is one thing to say that the effect of th[e] erroneous burden-shifting [effectuated by a rebuttable presumption] will be disregarded if the record developed at trial establishes guilt beyond a reasonable doubt; it is quite another to say that the jury's failure to make *any* factual determination of the elemental fact—because of a conclusive presumption resting upon findings that do not establish beyond a reasonable doubt the elemental fact—will be similarly disregarded.

*Carella,* 491 U.S. at 273, 109 S.Ct. at 2424 (Scalia, J., concurring) (internal quotation marks omitted) (arguing the particular propriety of the *Carella* test to the conclusive presumption context). Thus, I do not think that the *Yates* test can and should be read as implicitly endorsing the type of factfinding the majority engages in today.

Finally, one might argue, as does the *Brecht* majority, that wholesale use of the *Brecht* test promotes the principles of restraint, often couched in terms of "comity" and "federalism," underlying the Supreme Court's more recent habeas jurisprudence. In response, I could only agree if "restraint" is defined solely in terms of state prisoners not being granted very many writs of habeas corpus. For, I think it obvious that factfinding on the basis of record evidence that the jury never considered cannot be cited as evidence of judicial restraint. So too do I think it obvious that principles of comity and federalism should *never* require the continued incarceration of a state prisoner who was not afforded his/her constitutional rights to have an impartial jury make the requisite factual and elemental determinations in his/her trial just because a federal judge or a panel of federal judges believe that guilt is "likely" spelt out by the record. *Cf. Bollenbach,* 326 U.S. at 614, 66 S.Ct. at 406.

### C.

Application of the *Carella* test to the case at bar easily yields the conclusion that the error here was not harmless.[18] I start from the premise that the question of whether an unlawful killing constitutes murder or manslaughter turns on whether or not the killing was committed with malice. *See ante* note 4. "An intention to inflict injury on the victim which is not justified on any lawful ground *or palliated by the existence of any mitigating circumstances* is malicious within the meaning of the law." *Commonwealth v. Colon–Cruz,* 408 Mass. 533, 562 N.E.2d 797, 808 (1990) (emphasis supplied) (quoting *Commonwealth v. McGuirk,* 376 Mass. 338, 380 N.E.2d 662, 666–67 (1978), *cert. denied,* 439 U.S. 1120, 99 S.Ct. 1030, 59 L.Ed.2d 80 (1979)); *see also Reddick v. Commonwealth,* 381 Mass. 398, 409 N.E.2d 764, 769 (1980) (malice and the presence of legal mitigation are "mutually exclusive"). The presence of "sudden combat" constitutes a mitigating circumstance sufficient to negate malice and to reduce a verdict of murder to manslaughter under Massachusetts law. *See Richard,* 384 N.E.2d at 638; *cf. Commonwealth v. Nardone,* 406 Mass. 123, 546 N.E.2d 359, 364 (1989) (distinguishing between assault with intent to murder and assault with intent to kill). And, when such a mitigating circumstance is adequately raised in the evidence (as sudden combat was here), the Commonwealth must prove the absence of this circumstance beyond a reasonable doubt. *See Commonwealth v. Nieves,* 394 Mass. 355, 476 N.E.2d 179, 182 (1985) (citing *Mullaney v. Wilbur,* 421 U.S. 684, 697–98, 95 S.Ct. 1881, 1888–89, 44 L.Ed.2d 508 (1975) and *Commonwealth v. Stokes,* 374 Mass. 583, 374 N.E.2d 87, 94 (1978)).

As the majority opinion states, it is at least reasonably likely that the jurors, on the basis of the challenged instruction, found malice solely upon finding that petitioner stabbed the victim deliberately and cruelly. The foregoing authority, however, makes clear that deliberate and cruel behavior is not nec-

---

**18.** Obviously, petitioner neither was acquitted of the charge on which the presumption was set up nor admitted at trial that if he did the stabbing, he did so maliciously. Thus, I restrict my inquiry under *Carella* to whether the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to malice that no rational jury could have found those facts without also finding malice.

essarily tantamount to malicious behavior. To be specific, the stabbing here could have been both deliberate and cruel, but administered in response to sudden combat, of which there is evidence in this record. Thus, I cannot say that, in this instance, "the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact." *Carella*, 491 U.S. at 271, 109 S.Ct. at 2423. Accordingly, the error had a "substantial and injurious effect or influence in determining the jury's verdict." The petition, therefore, should be granted.[19]

19. Even were I to employ the deferential standard of review the majority utilizes, I could not join the majority opinion. As I have explained, the error committed here had the effect of deterring the jury from considering evidence of sudden combat. Yet, there was an abundance of such evidence; indeed, it is undisputed that the stabbing took place in the midst of a drunken melee. In light of this, and in light of the further fact that the Commonwealth bore the burden of proving an absence of sudden combat beyond a reasonable doubt, *see Nieves*, 476 N.E.2d at 182, I am at a loss to see how the error can be viewed as harmless even under *Brecht*.