COMMONWEALTH *vs.* FERNANDO D. CARRION.

Suffolk. February 6, 1990. - April 17, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Instructions to jury, Mistrial. *Evidence,* Cross-examination, Consciousness of guilt, Relevancy and materiality.

At the trial of a first degree murder indictment there was no evidence presented of reasonable provocation, sudden combat or self-defense to warrant the judge in granting the defendant's request for a jury instruction on voluntary manslaughter. [266-268]

At a murder trial the judge acted within his discretion to retract a jury instruction he had given on self-defense, where the evidence presented did not warrant an instruction on that issue. [268-269]

At a murder trial the judge's instructions to the jury, in the context of the whole charge, adequately conveyed to a reasonable juror the Commonwealth's burden of proving every element of the case beyond a reasonable doubt and the defendant's corresponding right not to testify. [269-272]

The judge at a murder trial properly exercised his discretion to exclude a question on cross-examination of the prosecution's main witness with respect to the witness's drug use in prison, a collateral matter. [272-274]

At a murder trial there was no error in the judge's declining to strike evidence of a "wanted" poster featuring the defendant which was properly admitted on the issue of the diligence of the police, nor was a mistrial warranted in the circumstances. [274-276]

The evidence at a criminal trial warranted the judge's giving a jury instruction on consciousness of guilt [276-277]; and in the context of the instructions as a whole there was no error in the judge's correction of a misstatement on the issue by a subsequent curative charge [277-278].

No reason appeared on the appeal of a first degree murder conviction for the exercise of the court's extraordinary power under G. L. c. 278, § 33E. [278]

INDICTMENT found and returned in the Superior Court Department on October 13, 1987.

The case was tried before *Robert J. Hallisey*, J.

*Jonathan Shapiro* (*Joshua Dohan* with him) for the defendant.

*Lauren Inker*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. A Superior Court jury found the defendant, Fernando D. Carrion, guilty of the murder in the first degree of Reynaldo Santiago, based on extreme atrocity or cruelty. On appeal, the defendant asserts that the judge made five errors in the conduct of the trial: (1) in denying him a jury instruction on voluntary manslaughter; (2) in charging the jury on the defendant's choice to remain silent; (3) in excluding a question on cross-examination of the Commonwealth's chief witness; (4) in allowing in evidence the contents of a police "wanted" flyer; and (5) in his charge on consciousness of guilt. In addition, the defendant asks us to use our discretionary power under G. L. c. 278, § 33E (1988 ed.), to order a new trial or to reduce the verdict to murder in the second degree. We conclude that there was no error, and that the defendant is not entitled to relief under § 33E. We therefore affirm.

The Commonwealth's case relies heavily on the testimony of Maria Perez, the girl friend[1] of the victim. According to Perez, on September 8, 1986, she and the victim set off for the basement of a house at 17 Hendry Street in the Dorchester section of Boston, where drug users congregated ("shooting gallery"), to get high on drugs. The house was located across from an empty lot on Downer Court, where Perez lived with her mother. After sitting on the back steps of the house for awhile, the two descended into the basement and injected heroin. At some point, Santiago left Perez in the "shooting gallery," and walked alone to a nearby store at the

---

[1]Throughout these events and subsequent proceedings, Perez consistently referred to the victim as her "husband," despite the fact that she and the victim were not legally married and both lived separately with their respective parents.

corner of Downer Court and Bowdoin Street. Five to ten minutes after Santiago's departure, the defendant "rushed" into the basement, looking for Santiago. He appeared to be angry and frustrated. The defendant left the "shooting gallery" several minutes later, and Perez went outside to sit on the back steps where she waited for Santiago until he returned from the store.

Some time later, the defendant reappeared and both men began at once to argue loudly.[2] Santiago threw his soda bottle to the ground by his feet, smashing it, and walked away in the direction of Downer Court. The defendant followed him, and the two kept arguing. Santiago went over a fence onto a vacant lot on Downer Court, and the defendant climbed over after him. Perez remained seated on the back steps of 17 Hendry Street, but she was no longer watching.

Santiago's loud screams brought Perez to her feet, at which point she looked over the fence and saw the defendant stab Santiago twice, as the latter held onto an abandoned car for support. At that time, the defendant looked up, ran toward Perez, climbed over the fence, and dashed back toward Hendry Street, in the direction from which he had first appeared. Perez noticed his clothes and hands were covered with blood. The victim was taken to Boston City Hospital, and by the time Perez arrived at the hospital, Santiago was dead.

A medical examiner testified that the autopsy reports showed that the victim had been stabbed in six different places — twice in the chest, and once each in the head, shoulder, arm, thigh, and back — with a knife that was at least five inches long. Either of the two chest wounds, having penetrated each lung, alone would have been sufficient to cause death. One of these wounds, which punctured the victim's left lung, had "separate tracks," indicating the knife had been plunged in, retracted part of the way, and plunged

---

[2]Perez testified that she did not listen to one word either man addressed to the other, "because they always argued, so I wasn't paying no mind." She insisted that her inattention had nothing to do with the fact that she was high on heroin.

in again. The head wound penetrated not only the scalp but part way into the skull bone as well. The medical examiner testified at length about the severe pain each of these wounds individually would have caused the victim, for the approximately one-half hour that elapsed before he lost consciousness.

There was no witness to any physical contact between Santiago and the defendant prior to the two stab wounds Perez saw the defendant inflict on Santiago. No weapon was found either on the victim's body or during the police search on Downer Court. The police issued an arrest warrant for the defendant on October 6, 1986, and on October 14, 1986, circulated a "wanted" flyer describing the defendant and stating that he was being sought in connection with the murder of Santiago. The defendant was arrested at his home on August 5, 1987. At the police station, he gave the police a false address as well as a false name, and he signed that false name to the booking sheet.

At the time of the defendant's trial, Perez was incarcerated in the Massachusetts Correctional Institution at Framingham (Framingham), for having violated probation on a previous conviction of possession of a hypodermic needle. Perez identified the defendant at his trial, and also described the changes in his appearance from the day she saw him kill her boy friend.

1. *The failure to give a jury instruction on voluntary manslaughter.* The defendant requested a jury instruction on voluntary manslaughter, which was refused. While the defendant did not object to the judge's failure to give this particular charge after the jury instructions were complete, the judge had explicitly told defense counsel prior to the instructions that he would "save his rights" with regard to the manslaughter question, and so the issue is properly preserved for appellate review. *Commonwealth* v. *Dunton*, 397 Mass. 101, 102 n.2 (1986).

A manslaughter instruction is required if, on "any view of the evidence," regardless of the credibility, manslaughter may be found. *Commonwealth* v. *Pitts*, 403 Mass. 665, 667

(1989). *Commonwealth* v. *Bellamy*, 391 Mass. 511, 514 (1984). *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 745-746 (1975). However, the defendant is not entitled to such a charge if there is no evidence which would support a finding of manslaughter. *Commonwealth* v. *Freiberg*, 405 Mass. 282, 302 (1989). *Commonwealth* v. *Bellamy*, *supra*. *Commonwealth* v. *Vanderpool*, *supra*.

Voluntary manslaughter is unlawful homicide arising not from malice, but "from the frailty of human nature," as in a case of "sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense." *Commonwealth* v. *Nardone*, 406 Mass. 123, 130-131 (1989). For a defendant to be entitled to a charge on voluntary manslaughter, there must be some evidence that could raise a reasonable doubt that the killing occurred in the heat of sudden passion. *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1983). In the absence of evidence of reasonable provocation, sudden combat, or self-defense, "[t]he jury could not be permitted merely to speculate on whether the defendant in the course of [a] struggle might have been roused to the heat of passion." *Id*. *Commonwealth* v. *Freiberg*, *supra*. *Commonwealth* v. *Pitts*, *supra* at 668. *Commonwealth* v. *Garabedian*, 399 Mass. 304, 315 (1987). *Commonwealth* v. *Bellamy*, *supra* at 515.

In this case, the only evidence of the dispute between the defendant and the victim, prior to the actual stabbing of the victim, is of a loud argument. "Insults or quarrelling alone cannot provide a reasonable provocation." *Commonwealth* v. *Zukoski*, 370 Mass. 23, 28 (1976). *Commonwealth* v. *Vanderpool*, *supra* at 746. There was nothing that could raise a reasonable doubt on the basis that "reasonable provocation" or "sudden combat" spurred the defendant to kill the victim in the heat of passion. For cases where no charge was required, see *Commonwealth* v. *Zukoski*, *supra* at 28-29 (defendant testified that victim threw glass of beer and swore at him; he knocked her to ground and then kicked her repeatedly until she died); *Commonwealth* v. *Vanderpool*, *supra* at 745 n.2 (defendant testified that victim called him a liar and

took a swing at him, but being intoxicated, missed); *Commonwealth* v. *Griffin*, 19 Mass. App. Ct. 174, 188 (1985) (defendant testified that victim, while riding a motorcycle on the road alongside car defendant was driving, gestured at defendant in an obscene way, and kicked his car door).

The evidence did not raise a reasonable doubt as to whether the defendant acted in self-defense. Therefore, an instruction on manslaughter based on the use of excessive force in self-defense was not required. A defendant is not entitled to a jury instruction on self-defense unless the evidence warrants at least a reasonable doubt on the basis that he had "reasonable ground to believe, and actually did believe that he was in imminent danger of death or serious bodily harm." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). In general, self-defense is unavailable to the person who initiates the fray. *Commonwealth* v. *Bellamy*, *supra* at 515. *Commonwealth* v. *Johnson*, 379 Mass. 177, 180-181 (1979). There was evidence that the defendant was angry and looking for the victim. No weapons were ever discovered, and there was testimony that the victim carried no weapon on the day of his death. The evidence at trial indicates that the victim, rather than the defendant, attempted to walk away from the argument at the outset, and was pursued by the defendant over the fence. Also, the stabbing occurred in a vacant lot fronting on a public street. Further, there were no facts or reasonable inferences that would raise a reasonable doubt on the basis that the defendant may have been acting defensively, albeit with excessive force.

The defendant also asserts that the judge invaded the province of the jury by not only refusing to give the manslaughter charge, but also by explaining to them why he would now have to retract the earlier charge he had given them concerning self-defense. He reminded the jurors that he had instructed them at great length about self-defense, but had concluded that was not an option available to them, because "the evidence would not support any inference that Santiago started the trouble; that would be beyond reasonable inference and as a matter of law, speculation and conjec-

ture." The method and extent of a jury charge is within the discretion of the trial judge. *Commonwealth* v. *Cobb,* 379 Mass. 456, 467 (1980). *Commonwealth* v. *Therrien,* 371 Mass. 203, 206 (1976). It was within his discretion to correct the impression he may have left with jurors regarding self-defense where there was no evidence to support such a theory. "The judge did not forfeit his impartiality or 'impose upon the jury his own notion of which inferences [were] reasonable.' " *Commonwealth* v. *Therrien, supra* at 207, quoting *United States* v. *DeLoach,* 504 F.2d 185, 190 (D.C. Cir. 1974). Since there was no evidence that raised the question of self-defense, the judge committed no error in correcting an earlier charge.

2. *Jury charge on the defendant's right to remain silent and the prohibition against drawing adverse inferences therefrom.* The defendant requested an instruction on his right not to testify at his trial. The judge gave the requested instruction, almost verbatim, but added a further explanation. The defendant objected to that elaboration and asserts that the additional comment amounted to reversible error. *Commonwealth* v. *Morgan,* 369 Mass. 332, 340-341 (1975).

The judge charged the jurors as follows (the first three paragraphs are almost identical to that requested by the defendant):

> "The sole burden of proof is on the prosecution. There is none on the defendant. It's the Commonwealth's burden to prove the identity of the defendant and each part of the elements of the charge against him beyond a reasonable doubt. This burden never shifts to the defendant. The defendant has no duty to produce any evidence nor to testify on his own behalf. This concept is so important that I want to stress the point by going into some further detail.
>
> "Under our Constitution, the defendant has an absolute right not to testify. In this case, the defendant has exercised that lawful right. The fact that he has elected

not to take the stand is in no way to be regarded by you as involving the question of his innocence or his guilt.

"I instruct you emphatically that in the jury room you may not speculate about why he did not take the stand. I've told you why. He's exercised a lawful right. So you must not even allow yourself to wonder why.

"It's hard to do. Because in normal life, if somebody — one of your friends came back with your automobile that they borrowed and it had a crunched fender and you ask them what happened and they said, 'I don't care to discuss it,' you would draw some adverse inferences or worse. But you can't do that here. You've got to suppress that and go by the Constitution.

"If you have trouble with this, spend a little bit of time thinking of the kind of society we'd have if the rules were the other way, if the defendant is presumed guilty, that he's got to prove his innocence. You'd have a monstrous police state because few people can match the resources of the government . . . ."

The legal adequacy of a particular instruction to the jury can only be judged in the context of the whole charge, and not on the basis of limited or isolated portions of it. *Commonwealth* v. *Matthews*, 406 Mass. 380, 390 (1990). *Commonwealth* v. *Lanoue*, 392 Mass. 583, 591 (1984). *Commonwealth* v. *Costello*, 392 Mass. 393, 401 (1984). This is because it is impossible to gauge the over-all impact on a reasonable juror of any one piece parsed out of an instruction without examining the entire charge in which it was delivered. *Commonwealth* v. *Matthews, supra. Commonwealth* v. *Repoza*, 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987). *Commonwealth* v. *Adrey*, 397 Mass. 751, 753-754 (1986). *Commonwealth* v. *Quigley*, 391 Mass. 461, 467, cert. denied, 471 U.S. 1115 (1984).

The defendant objects to the judge's embellishment of the charge by adding an example of what it means to draw adverse inferences from silence, in order to illustrate to the jury what the Constitution forbids them to do. It is within the

judge's discretion to frame a jury charge to make it more intelligible to jurors. *Commonwealth* v. *Silva*, 388 Mass. 495, 507 (1983). This is what the judge artlessly sought to do.

Although the judge's analogy teeters on the brink of reversible error, the context of his remarks saves the instruction. The judge clearly stated the Commonwealth's burden and that no adverse inference is to be drawn from the failure of the defendant to take the stand. *Commonwealth* v. *Adrey*, *supra* at 755. *Commonwealth* v. *Costello*, *supra* at 402. *Commonwealth* v. *Medina*, 380 Mass. 565, 578 (1980). *Commonwealth* v. *Fielding*, 371 Mass. 97, 116 (1976).[3] Furthermore, in the remainder of his charge the judge repeatedly stressed, correctly and forcefully, the exacting burden of proof on the Commonwealth. *Commonwealth* v. *Adrey*, *supra* at 754. *Commonwealth* v. *Costello*, *supra* at 401-402 n.5. *Commonwealth* v. *Medina*, *supra*. He underscored the defendant's rights under the United States Constitution, after his discursive meandering into the hypothetical life experience of the jurors, even reminding them of the reason why the Framers assured defendants those rights. *Commonwealth* v. *Costello*, *supra* at 401. Furthermore, his reference to unexplained damage to a motor vehicle was so contextually dif-

---

[3]For an example of a charge which was found to have given jurors an erroneous impression about the burdens of proof of the Commonwealth and the defendant, see *Commonwealth* v. *Sneed*, 376 Mass. 867, 872 (1978). In that case, the judge in his main charge had referred to the defendant's election not to testify by saying, "I won't say anything about the fact that [the defendant] sits here and it was within the knowledge of the defendant." He then prefaced his charge and addressed particularly the defendant's silence at trial by stating that he was giving it "so that the defendant will not say that I violated any of his rights." He then instructed the jury, "He didn't take the stand, as you noticed, and that's his constitutional right, and we ask the jury not to draw any inference from his refusal to take the stand." Immediately thereafter, he turned to defense counsel and said, "Do you want to object to that counsellor?" Defense counsel complied, and the judge then told the jury to "disregard what I just said so there won't be any exceptions." He gave no further instructions and did not elaborate for the jury the Commonwealth's burden of proof beyond a reasonable doubt of all elements, and the absence of any burden at all on the defendant.

ferent from a defendant's failure to testify in his own defense as to make it unlikely that the jury drew the adverse inference that the judge clearly told them was improper. We conclude that the judge's charge adequately conveyed to a reasonable juror the Commonwealth's burden of proving every element of the case beyond a reasonable doubt and the defendant's corresponding right not to testify and not to have that silence used against him. Therefore, there was no reversible error.

3. *Excluding cross-examination question of witness's drug use in prison.* The defendant asserts that the judge committed prejudicial error in excluding a question asked on cross-examination of the Commonwealth's chief witness, Maria Perez.

Defense counsel had examined the witness extensively about her drug use during the day of the murder. She acknowledged, in answer to a general question, that she was a heroin addict. But in response to a number of more specific questions about her habit — how much she used, how often, where did she buy the drugs, did she sell drugs, how did she support her need for heroin — she asserted her constitutional privilege not to incriminate herself, and the judge upheld that assertion. He informed defense counsel that he could not inquire into any areas of the witness's drug-related activities for which Perez had not waived her privilege not to testify.

At the end of a recess, a court officer returned to inform the judge and the attorneys that Perez had taken ill in the women's room, where she had vomited and felt dizzy and faint. Since it was the Friday before a long weekend, the judge dismissed the jurors early and set the next trial day for the following Tuesday. Defense counsel then requested that the judge order Perez to submit to a drug test, to determine whether she had been under the influence of drugs while testifying that day.[4] The judge declined to do so, stating he was

[4]Defense counsel cited not only the fact that Perez had taken ill, but also that she had seemed "drowsy and unresponsive at times" during the afternoon session of cross-examination, as · grounds for his drug test request.

unconvinced that those facts constituted enough of a showing
of drug use, when it was perfectly plausible that Perez might
have become ill because "she has been on the grill all day
long, and . . . it's a harrowing experience for her." However,
he agreed to ask that Framingham prison medical personnel
send along with the witness the following Tuesday any
records that might list any medication she had been taking
there. Counsel for both sides agreed to this solution.

When the trial reconvened that Tuesday, Perez was back
on the witness stand and the defense counsel resumed re-
cross-examination. His first question to her that morning
was, "Ms. Perez, do you use drugs at Framingham?" The
prosecutor objected, and the judge sustained that objection.
Defense counsel did not attempt to pursue that line of ques-
tioning, but immediately shifted to questions about Santi-
ago's drug use on September 8, 1986.[5]

In general, the trial judge has broad power to determine
the relevancy and extent to which evidence of collateral mat-
ters will be admitted. Commonwealth v. Porter, 384 Mass.
647, 657 (1981). Commonwealth v. Pettijohn, 373 Mass. 26,
30 (1977). While defendants are entitled to reasonable lati-
tude on cross-examination, the scope of such cross-examina-
tion, including the extent of impeachment of a witness for
credibility and competency, are well within the judge's sound
discretion. Id. Commonwealth v. Sandler, 368 Mass. 729,
737-738 (1975). Commonwealth v. Williams, 25 Mass. App.
Ct. 210, 218 (1987).

Evidence of the witness's use of illegal drugs, legally pre-
scribed medication, or alcohol at the time of the events con-
cerning which she was testifying, or evidence of a pattern of

---

[5]During a bench conference on an unrelated subject later that morning,
upon the prosecutor's reminder, the judge asked a court clerk if Perez's
medical records from Framingham had been sent along with her to court
that morning. The clerk said he had been assured, when he spoke with
medical officials at Framingham the previous Friday, that the records
would be delivered, but that no such records had accompanied the witness.
The judge asked the clerk to check on the matter, and the clerk agreed.
No one, including defense counsel, ever brought up the question of Perez's
Framingham medical records again.

such drug or alcohol addiction, if it would impair the witness's ability to perceive and to remember correctly, is admissible on cross-examination to attack the witness's credibility. *Commonwealth* v. *Adrey*, 376 Mass. 747, 752 (1978). *Commonwealth* v. *Caine*, 366 Mass. 366, 369 (1974). *Commonwealth* v. *Williams*, *supra* at 218. However, there is no apparent connection between the witness's possible use of drugs at Framingham and the witness's ability to perceive, remember, or testify to the events in question. It is the burden of the proponent of drug use or other mental impairment related evidence to show the judge abused his discretion in excluding the question asked. *Commonwealth* v. *Caine*, *supra*.

Additionally, we note that the judge permitted the defendant great latitude in cross-examining Perez about her being a heroin addict and regular denizen of the "shooting gallery," as well as her drug use the day of Santiago's killing. Defense counsel mined this vein of impeachment extensively. The judge's refusal to allow counsel to elicit an answer to a single question about Perez's drug use while in prison did not prejudice his right to impeach this witness.

4. *Denial of a mistrial.* The defendant moved for a mistrial based on the admission in evidence of the contents of a "wanted" flyer police circulated in October, 1986, describing the defendant and stating he was being sought for the murder of Santiago. The defendant asserts this was error because the Commonwealth never proved the defendant knew or had reason to know about the police flyer. Initially, the judge informed the jury that the information was being admitted to show the defendant's "consciousness of guilt." After the witness read the contents, defense counsel objected and moved to strike the evidence. At sidebar, the prosecutor reminded the judge that he was also submitting the evidence to rebut the defendant's theory that the Boston police department lacked diligence in investigating the case, "that nothing was done for a year," as explaining the eleven-month delay between the time of the killing and the defendant's arrest. The judge then instructed the jurors about permissible inferences

adverse to the Commonwealth that could be drawn from evidence about the quality, or lack thereof, of police diligence and thoroughness in investigating the killing, but did not directly tie the police flyer to rebutting this theory. Nor did he ever strike the evidence of the "wanted" flyer's contents. During his final charge of the jury, when he returned to the subject of consciousness of guilt, the judge explained what he meant, and gave examples of evidence that would support inferences of consciousness of guilt, as well as consciousness of innocence. He did not mention the police "wanted flyer" as showing "consciousness of guilt."

It is clear, as the Commonwealth acknowledges, that the police flyer was inadmissible to show the defendant's consciousness of guilt, when there was no evidence to suggest that the defendant knew about its existence. However, a "wanted" poster with a complete description of the defendant, issued one month after the killing for which he was sought, has some relevance to rebutting an argument that the police lacked diligence in investigating the crime and only arrested a suspect eleven months later. Defense counsel made a general motion to strike and moved for a mistrial — he did not at any point object to the use of the "wanted" flyer's contents for the limited purpose of showing that the police had been investigating the case in a prompt manner. Evidence admissible for one purpose, if offered in good faith, is not inadmissible by the fact that it could not be used for another purpose. *Commonwealth* v. *Carroll*, 360 Mass. 580, 588 (1971). *Commonwealth* v. *Rawlins*, 352 Mass. 293, 295 (1967). Thus, there was no error in the judge's failure to strike the evidence.

It would have been advisable for the judge to have given a clearer curative instruction, expressly explaining to the jury that the flyer had no relevance to consciousness of guilt, and that its contents were evidence solely on the issue of diligence of police work. We cannot say, however, that the lapse was enough to require the granting of a mistrial. See *Commonwealth* v. *Toro*, 395 Mass. 354, 359 (1985) (decision to declare mistrial is within judge's discretion). The contents of

the flyer read to the jury merely named the defendant, Fernando Carrion, described him, and stated that he was wanted for the murder of Santiago. There was no question that the defendant was the same person identified in the poster as being sought for the same charge as the one being tried. Cf. *Commonwealth* v. *Booker*, 386 Mass. 466, 470 (1982) (evidence that came in for purpose of showing consciousness of guilt also implicated the defendant in different, unrelated crimes — but was still within discretion of judge to admit with limiting instruction). We are convinced that the judge's imprecise curative instruction regarding the evidence admissible for a limited purpose could not have "appreciably influenced the jury or tainted their verdict," *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982), quoting *Commonwealth* v. *Vanetzian*, 350 Mass. 491, 495 (1966). Furthermore, even if the instruction constituted error, it was so insignificant to justify the conclusion that it was not prejudicial in terms of its probable impact on the reasonable juror. *Commonwealth* v. *Morgan*, 369 Mass. 332, 340-341 (1975).

5. *The jury charge on consciousness of guilt.* Because the Commonwealth never introduced any evidence that would have made the police "wanted" flyer relevant on the question of the defendant's consciousness of guilt, the defendant asserts the judge should never have given a jury instruction on consciousness of guilt at all. Further, he argues, the instruction given was faulty. We find no error on either issue.

Even without the police flyer, the evidence admitted at trial warranted the judge's decision to instruct the jury on consciousness of guilt. Police officers who arrested the defendant and booked him at the station testified that the defendant identified himself with a false name and address. False statements made to the police are a standard example of admissible evidence on consciousness of guilt. *Commonwealth* v. *Basch*, 386 Mass. 620, 624 (1982). *Commonwealth* v. *Toney*, 385 Mass. 575, 584 n.4 (1982). *Commonwealth* v. *Porter*, 384 Mass. 647, 656 n.12 (1981). In addition, there was some evidence from police that it took them as long as it did to arrest the defendant because on twenty or so occasions

of surveillance of the defendant's house, they never found him to be there. If believed, this evidence could support an inference that the defendant was in flight from law officers. Flight is perhaps the classic evidence of consciousness of guilt. *Commonwealth* v. *Booker, supra* at 470. *Commonwealth* v. *Toney, supra* at 583. *Commonwealth* v. *Gilday,* 367 Mass. 474, 496 (1975). Finally, there was some evidence that the defendant's appearance had been altered, from which a jury could draw the inference that he had purposely altered his appearance to conceal evidence — i.e., his physical characteristics. That, too, was admissible on consciousness of guilt. *Commonwealth* v. *Toney, supra* at 584 n.4. There was no error in giving the jury an instruction on consciousness of guilt.

The judge defined consciousness of guilt for the jurors on three occasions. In the course of his first instruction, the judge unfortunately made reference by analogy to the inference that can be drawn from a party's failure to produce evidence known to be in the party's possession. However, he went on accurately to discuss the equivocal nature of consciousness of guilt evidence in general, and explained how there are many other reasons why an innocent person might behave the same way, and how such evidence is never enough to convict a defendant. See *Commonwealth* v. *Stewart,* 398 Mass. 535, 548 (1986). *Commonwealth* v. *Toney, supra* at 585. Later the same morning, he gave a second instruction in which he told the jurors expressly that he had been wrong to use the analogy, explained why the analogy was inappropriate, and impressed on them the burden of proof of the Commonwealth and the absence of any such burden on the defendant. Finally, in his charge to the jury before they began deliberations, the judge gave one last instruction on consciousness of guilt, in which he again stressed the dubious nature of such evidence, and charged them about the evidence in the case leading to the opposite inference of consciousness of innocence as well.

The defendant focuses on the judge's admitted error in the charge on consciousness of guilt. However, the judge prop-

erly corrected his misstatement by a subsequent curative charge to the jury. *Commonwealth* v. *O'Neal*, 367 Mass. 440, 445 (1975). *Commonwealth* v. *LaVoie*, 9 Mass. App. Ct. 918, 919 (1980). See *Commonwealth* v. *Toro*, 395 Mass. 354, 359 (1985). In the context of the explicit correction and the extensive accurate explanation of consciousness of guilt there was no error. *Commonwealth* v. *Grace*, 376 Mass. 499, 501 (1978).

6. *G. L. c. 278, § 33E*. The defendant was found guilty of murder in the first degree on the ground of extreme atrocity or cruelty. As required by G. L. c. 278, § 33E, we have carefully reviewed the record and are satisfied that the defendant received a fair trial, at which he was represented by able and diligent counsel, and that the verdict was supported by the weight of the evidence. The defendant has asked us, however, to use our discretionary power under § 33E to reconsider the verdict as, if not technically unsupported by the evidence, not consonant with justice, given the circumstances of the killing in this case. We decline to do so.

"Regard for the public interest impels us to use with restraint our power under § 33E to modify a jury's verdict." *Commonwealth* v. *Garabedian*, 399 Mass. 304, 316 (1987), quoting *Commonwealth* v. *Williams*, 364 Mass. 145, 151 (1973). There was evidence of an unprovoked attack on the victim by the defendant resulting in six deep wounds likely delivered by a knife at least five inches long; at least one indicating the knife had been withdrawn and plunged in again in the same wound; two of the stab wounds each independently would have been enough to kill the victim; and that the victim was likely to have suffered severe pain while conscious for at least one-half hour after the attack. On the basis of this evidence we will not disturb the jury's verdict that the defendant was guilty of murder in the first degree.

*Judgment affirmed.*