**Robert LeBLANC, Petitioner,**

v.

**Ronald DUVAL, Respondent.**

**Civ. A. No. 92–10176–NG.**

United States District Court,
D. Massachusetts.

Sept. 27, 1995.

Robert LeBlanc, South Walpole, MA, pro se.

Albert F. Cullen, Jr., Cullen & Butters, Boston, MA, for Petitioner.

Gregory I. Massing, Attorney General's Office, Boston, MA, Nancy W. Geary, Attorney General's Office, Criminal Bureau, Boston, MA, for Respondent.

1. Under Massachusetts practice, a collateral appeal, as from a motion for a new trial made after final judgment has entered, will only be heard by the Supreme Judicial Court if a single justice of that Court finds that the appeal presents a "new and substantial question." M.G.L. ch. 278 § 33E.

2. The petition alleged the follow grounds for relief:

   A: Instructions to jury created a conclusive presumption of intent and malice by courts use of burden shifting language in violation of the 14th Amendment to the United States Constitution.

## MEMORANDUM AND DECISION

GERTNER, District Judge:

### I. INTRODUCTION

On March 23, 1976, a jury found petitioner Robert LeBlanc guilty of the first degree murder of Sgt. Richard F. Halloran of the Boston Police Department, and he was sentenced to life imprisonment. The Supreme Judicial Court affirmed the conviction. *See Commonwealth v. LeBlanc,* 373 Mass. 478, 367 N.E.2d 846 (1977).

On May 13, 1988, petitioner filed a *pro se* motion for a new trial in Superior Court, raising six claims of error. The Superior Court Judge refused to hear the first three claims on the ground that they were not raised at trial. The remaining three claims were rejected on the merits.

On November 1, 1990, petitioner, still *pro se,* moved before a single justice of the Supreme Judicial Court for leave to appeal and for appointment of counsel. Counsel was appointed and argued the leave to appeal motion before the single justice, who denied it without written opinion.[1]

On January 8, 1992, petitioner, *pro se,* filed this petition for writ of habeas corpus asserting the same six claims of error raised in his motion for a new trial. On March 20, 1992, respondent filed a motion to dismiss the petition on the grounds that petitioner had procedurally defaulted on certain of his claims, and had failed to exhaust his state court remedies on any of the claims. On September 10, 1992, this Court, Zobel, J., allowed respondent's motion to dismiss claims A through E, leaving only claim F, which alleged ineffective assistance of counsel.[2]

   B: Instructions to jury regarding intoxication violated the 14th Amendment to the United States Constitution by courts use of burden shifting finding language as to the elements of premeditation and malice.

   C: Instructions to jury substantially affected jurors state of mind by courts reference to the appellate process and had a diluting affect on each jurors individual responsibility and severed to further strengthen the harm created by grounds one and two (above) in violation of the 14th Amendment to the United States Constitution.

   D: Conviction obtained and subsequent appeal denied without due regard for the actual innocence of petitioner in violation of the

On October 13, 1992 petitioner wrote to the Court, requesting reconsideration the Court's decision with respect to claims A and D, and appointment of counsel. On December 3, 1992, the Court appointed counsel to represent petitioner, but did not otherwise act on his request.

On March 8, 1994, petitioner, now represented by counsel, filed a memorandum in support of his petition. The memorandum argues in favor of issuing the writ on the basis of claims A and F of the petition. Since respondent in his opposition has thoroughly addressed both of these claims, I will treat petitioner's memorandum as supporting his motion for reconsideration of the Court's dismissal of claim A, as well as issuance of the writ proper with respect to claim F.

## II. PETITIONER'S SANDSTROM CLAIM (CLAIM A)

Petitioner contends that his trial was constitutionally defective because the judge's instructions to the jury permitted jurors to presume the intent element of first degree murder, contrary to the teaching of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The judge's instructions included the following statement:

> "[A] person is presumed to intend the consequences of his acts. And someone who uses a dangerous weapon, if you find such existed, is presumed to have intended the natural consequence in the use of a dangerous weapon without regard to the harm or grievous injury or death that it would inflict upon the person against whom it is directed. In that situation it would be sufficient to constitute malice aforethought."

This statement is almost identical to a statement which the *Sandstrom* court found to be constitutionally defective because it shifted the burden of proving of an element of the crime, namely intent, from the prosecution to the defense.[3]

Respondent makes four arguments in support of dismissal of this claim: 1) that it is procedurally barred, 2) that it is barred by the doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding generally that new rules of law should not be applied retroactively in habeas corpus cases), 3) that the trial judge's faulty language was cured by other parts of his instruction stating the correct burden of proof, and 4) that any error committed by the trial judge was harmless. I address each argument in turn.

### A. Procedural Bar

It is by now well settled that claims may not be raised in a habeas corpus petition where they were barred in the state court proceeding by an independent and adequate procedural ground. *See Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977). In order for a procedural ground to be adequate, however, it must be "strictly or regularly followed" by the courts of the state invoking it. *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988); *Dugger v. Adams*, 489 U.S. 401, 410, n. 6, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989); *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (procedural requirement must be "consistently applied" to bar habeas review).

Respondent contends that petitioner's *Sandstrom* claim is barred because it was rejected by the Superior Court on an independent and adequate procedural ground, namely that petitioner had failed to raise it at trial. However, as petitioner points out, the Supreme Judicial Court has carved out an exception to this rule for *Sandstrom*-type claims arising out of convictions which became final before *Sandstrom* was decided. The Court reasoned that the case law prior to *Sandstrom* provided insufficient guidance

---

14th Amendment to the United States Constitution.

E: Prejudicial nature of prosecutors closing arguments to jury violated the 14th Amendment to the United States Constitution.

F: Denial of effective assistance of counsel at trial and on direct appellate review in viola-

tion of the 6th Amendment to the United States Constitution.

3. The *Sandstrom* jury was instructed that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 513, 99 S.Ct. at 2454.

for the defendant to have had "a genuine opportunity" to raise the issue at trial. *De-Joinville v. Commonwealth*, 381 Mass. 246, 250–251, 408 N.E.2d 1353 (1980). *See also Commonwealth v. Repoza*, 400 Mass. 516, 520, 510 N.E.2d 755 (1987).

■ Thus, while petitioner does appear to have been found in default by the last state court to review his claim on the merits, it is clear that Massachusetts has not "strictly or regularly" imposed defaults in similar situations. Accordingly, Massachusetts' ground for denying petitioner's claim was not "adequate" within the meaning of *Johnson v. Mississippi*, 486 U.S. at 587, 108 S.Ct. at 1987, and does not, therefore, stand as a bar to this Court's own review.

Such a conclusion is, however, a pyrrhic victory for the petitioner. The very observation which excuses petitioner's failure to object at trial, that trial counsel could not have known that there were grounds to object, arguably undermines his position under the *Teague* doctrine.

### B. Teague *Doctrine*

In *Teague*, a plurality of the Court announced a new standard for determining whether new rules of law should apply retroactively to cases on collateral review. Noting that the principal purpose of habeas corpus review is to insure that state trials are conducted according to the constitutional standards in place at the time, the *Teague* plurality concluded that, ordinarily, a new rule of

constitutional law should not be applied retroactively to scrutinize convictions which became final prior to its announcement. 489 U.S. at 306, 109 S.Ct. at 1073. The plurality found only two narrow exceptions to this general principle of non-retroactivity: where the new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or where "it requires observance of those procedures that are implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 305–310, 109 S.Ct. at 1072–1075. A majority of the Court has since adopted this standard, making it binding precedent. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Saffle v. Parks*, 494 U.S. 484, 488–495, 110 S.Ct. 1257, 1260–1264, 108 L.Ed.2d 415 (1990).

The first question to be answered is whether *Teague* applies here because *Sandstrom*, on which petitioner relies, announced a new rule which was not in place when petitioner's conviction became final. Assuming it does, the second question is whether the rule that it announced falls within either of *Teague*s narrow exceptions.

#### 1. *New Rule*

■ Candidly, I cannot say that the case law regarding when a "new rule" is announced is unambiguous.[4] The cases state that, in the *Teague* context, a rule is considered "new" if, under a reasonable, good-faith interpretation of existing precedents, a state court would not have felt bound to follow it.

---

**4.** *Teague* effected a change in the common law principles of retroactivity, a change focused on cases reviewing state court judgments in habeas petitions. The common law practice "assumed that current understandings of the law would apply to any pending case, irrespective of the means by which the case came before the bar." Yackle, The Habeas Hagioscope, The Future of Habeas Corpus: Reflections on Teague v. Lane and Beyond, 66 S.Cal.L.Rev. 2331, 2381 (1993). As Yackle notes, that practice began to change in the 60s: "[I]n the 1960's, when the Court began interpreting the Constitution in innovative ways, there was pressure to apply its new precedent only to future cases and thus to deny their retroactive effect on judgments already in place. The Warren court responded by admitting a limited exception to the common law practice for new decisions marking significant departures from past, typically denominated 'clear breaks' with precedent. If such a decision did not protect

against convicting the innocent, and if its application would upset reliance interests, the Court denied its benefits to prisoners whose claim rested on prior events or judgments." Id. at 2382–83.

In the ensuing years, however, the debate swirled around whether the retroactivity rules were the same in habeas review of state convictions as on direct review, as well as fundamental questions concerning what constituted new rules to qualify for the exception to common law retroactivity principles.

*Teague* singled out cases on habeas review of state convictions for a special, far more narrow retroactivity principle. The Court held that new rules should neither be announced nor applied on collateral review. At the same time, the Court broadened the definition "new rule", and narrowed the exceptions. Id. at 2385.

*Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260. The implication is that a state court could have been wrong in its interpretation of existing federal precedents but that unless it was acting unreasonably or in bad faith, its erroneous interpretation of the federal precedents could bar federal review. In the cases after *Teague,* the Supreme Court has suggested that this characterization of "new" is so broad that it could be found to apply not only to petitioners seeking incremental changes in the law, but also to the application of settled standards to different facts, the prototypical mixed fact law question.[5] There is no question that the issue presented by this petition is in the latter category. At what point the application of settled law to new facts gives rise to a new rule remains an open question.

The precedent is helpful, but not dispositive. In *DeJoinville,* the Supreme Judicial Court concluded that the *Sandstrom* theory was not "sufficiently developed at the time of ... trial and appeal to afford the petitioner a genuine opportunity to raise his claim." *DeJoinville,* 381 Mass. at 248, 408 N.E.2d 1353. As the *DeJoinville* Court noted, *Sandstrom* relied on a number of prior Supreme Court cases, none of which, by themselves, would have clearly barred the contested instruction. *See DeJoinville,* 381 Mass. at 248–251, 408 N.E.2d 1353. Two of the cases relied upon by the *Sandstrom* Court address the constitutionally required burden placed on the prosecution in criminal cases. In *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court held that the reasonable doubt standard in criminal cases was constitutionally required, but said nothing about the types of presumptions which jurors could be instructed to make from the evidence. In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court invalidated a state law which categorized all intentional or reckless killings as murder, but permitted a conviction of manslaughter only if defendant proved certain extenuating circumstances. While both of these cases support the proposition that the prosecution always has the burden of proving all elements of a crime beyond a reasonable doubt, they do not directly address the issue raised in *Sandstrom,* namely whether the prosecution may satisfy that burden through evidentiary presumptions.

To be sure, the *Sandstrom* court also relied on two cases which did address evidentiary presumptions, but did so without relying on the United States Constitution. The Court's decisions in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (invalidating a jury instruction which specifically directed the jury to find "felonious intent", an element of the crime, based on other actions of the defendant) and in *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (invalidating an instruction which directed the jury to make a conclusive inference about the defendant's state of mind based on other evidence) were based on the Court's interpretation of federal criminal statutes and, as such, had no direct bearing on state prosecutions. Thus, prior to the Court's announcement in *Sandstrom,* no case had held that jury instructions containing presumptive inferences were constitutionally infirm.

This fact coupled with the available circuit precedent suggests that *Sandstrom* did in fact announce a new constitutional rule within the meaning of *Teague.* *Accord Cain v. Redman,* 947 F.2d 817 (6th Cir.1991) *cert. den.* 503 U.S. 922, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992); *Prihoda v. McCaughtry,* 910 F.2d 1379, 1382 (7th Cir.1990); *Gilday v. Callahan,* 866 F.Supp. 611 (D.Mass.1994) *aff'd on other grounds* 59 F.3d 257 (1st Cir. 1995).

Even if it did not announce a new constitutional rule, as I explain below, and retroactive application did not fit within *Teague* at all, the outcome would not be affected. Petitioner's claim would still be meritless because I conclude that the erroneous instruction was harmless.

---

**5.** *See Sawyer v. Smith,* 497 U.S. 227, 233–35, 110 S.Ct. 2822, 2826–27, 111 L.Ed.2d 193 (1990).

*See also* Yackle, *supra* at 2390 (1993).

## 2. *The Sandstrom Exceptions*

██ Having decided that the *Sandstrom* rule is "new", I must still consider whether it falls within the two narrow exceptions to the non-retroactivity rule. The first exception, concerning rules affecting private conduct, is clearly inapplicable. The second exception, however, presents a closer issue. That exception is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264. For a rule to qualify under this rubric, it must not only improve the accuracy of the trial, but "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer v. Smith,* 497 U.S. 227, 241, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (emphasis in original). The rule must be one whose observance is "implicit in the concept of ordered liberty." *Gilmore v. Taylor,* —— U.S. ——, ——, 113 S.Ct. 2112, 2119, 124 L.Ed.2d 306 (1993). The Court has often referred to the holding in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (requiring that every indigent criminal defendant be entitled to appointed counsel) as one example of such a rule. *See Saffle,* 494 U.S. at 494, 110 S.Ct. at 1263.

There can be no doubt that the *Sandstrom* rule increases both the fairness and accuracy of criminal trials, thus satisfying the first element of the *Teague* exception. The question, then, is whether it can be characterized as a "watershed" rule implicit in the concept of ordered liberty. Although the Supreme Court has had a number of occasions in the six years since *Teague* to consider whether new rules were worthy of the "watershed" label, it has found none to date. The rules which the Court has found "insufficiently bedrock" are striking. They include a rule relating to the ability of a jury to consider sympathy for the defendant in mitigation of capital sentencing (*see Saffle,* 494 U.S. at 494, 110 S.Ct. at 1263), a rule forbidding inaccurate prosecutorial argument diminishing juror responsibility in capital cases (*see Saw-*

*yer,* 497 U.S. at 243–244, 110 S.Ct. at 2832), and a rule forbidding interrogation of a defendant following his invocation of the right to counsel (*see Butler v. McKellar,* 494 U.S. 407, 415–417, 110 S.Ct. 1212, 1218–1219, 108 L.Ed.2d 347 (1990)).

The *Gilmore* case is especially significant to this analysis. In *Gilmore,* —— U.S. at ——, 113 S.Ct. at 2119, the Court considered whether to apply retroactively a new rule concerning jury instructions. The rule in question, which had been adopted by the Seventh Circuit in *Falconer v. Lane,* 905 F.2d 1129 (1990), invalidated jury instructions which failed to inform a jury that it could not return a murder conviction if it found that the defendant had a mental state which would reduce the crime to manslaughter. Although this rule presumably increased the accuracy of trials (by preventing the murder convictions of those only guilty of manslaughter),[6] the Court concluded that this type of rule did not fall into the "small core" of bedrock rules worthy of retroactive application.

While the Supreme Court has failed to find appropriate "bedrock" rules in the years since *Teague,* a number of circuit courts have made such findings. In *Williams v. Dixon,* 961 F.2d 448, 452–456 (4th Cir.1992), for example, the court approved the retroactive application of a new rule which struck down a state's requirement that a jury be unanimous in its acceptance of mitigating factors in capital sentencing. Similarly, in *Nutter v. White,* 39 F.3d 1154 (11th Cir.1994), the court retroactively applied a new rule prohibiting the use of "substantial doubt" as a synonym for "reasonable doubt" in jury instructions on the burden of proof.

Plausible arguments can be made both in favor of or against including *Sandstrom* in the pantheon of bedrock due process safeguards. Like the "substantial doubt" instruction at issue in *Nutter,* the instruction invalidated by *Sandstrom* improperly lessens the prosecutions burden of proving an ele-

---

6. Justice Blackmun, in dissent, went so far as to say that the rule was necessary to prevent the imposition of an ex post facto law on the defendant, through his conviction for an act which was not made illegal by state law at the time he committed it. *Gilmore v. Taylor,* —— U.S. at ——, 113 S.Ct. at 2128 (Blackmun, J., dissenting).

ment of the crime. Arguably, the instruction *Sandstrom* invalidated is even more offensive to the Constitution because it not only lessens the burden of proof but completely eliminates it with respect to an element of the crime.

Conversely, *Sandstrom*'s importance as a constitutional rule can be minimized by analogizing it to the failure properly to instruct the jury on a lesser included offense, i.e. the issue in *Gilmore*. While not always the case in a murder trial, the issue of the defendant's intent may go to the degree of the defendant's culpability, rather than its existence. For example, in Massachusetts, first degree murder entails a specific intent to kill or cause grievous bodily harm (*see Commonwealth v. Judge*, 420 Mass. 433, 437–438, 650 N.E.2d 1242 (1995)), second degree murder requires only malice and an intent to injure another (*see Richard v. Commonwealth*, 382 Mass. 300, 307, 415 N.E.2d 201 (1981)), while involuntary manslaughter requires no intent to injure but only wanton or reckless conduct (*see Commonwealth v. McCauley*, 355 Mass. 554, 560, 246 N.E.2d 425 (1969)). Thus, one can take the position that the jury's inference of the defendant's intent is likely to affect the particular offense for which the defendant is convicted, rather than the fact of conviction itself. *See Teague*, 489 U.S. at 313, 109 S.Ct. at 1076 (bedrock rules must be central to determination of innocence or guilt).

Like the issue of whether *Sandstrom* announced a "new" rule, the question presented here is a close one. As I indicated above, however, even if I were to find that *Sandstrom* fits within one of *Teague's* exceptions, and thus, should be retroactively applied, petitioner's claim would still fail because the error was harmless.

## C. *Harmless Error*

■ When a habeas court determines that a jury instruction impermissibly creates a conclusive presumption, it must further examine the trial record to determine whether the error was harmless. *Rose v. Clark*, 478 U.S. 570, 576–584, 106 S.Ct. 3101, 3105–3109, 92 L.Ed.2d 460 (1986); *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989). Two divided panels of the First Circuit have held that in reviewing *Sandstrom* type errors, a habeas court should apply the so-called "whole record" test appropriate to "trial" type error described in *Brecht v. Abrahamson*, 507 U.S. 619, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). *See Libby v. Duval*, 19 F.3d 733, 739 (1st Cir.1994); *Anderson v. Butler*, 23 F.3d 593, 597 (1st Cir.1994). Under this test, the writ should issue only if the reviewing court concludes that the instructional error "had a substantial and injurious effect or influence in determining the jury's verdict." *Anderson*, 23 F.3d at 597.[7] Thus, respondent has the burden of demonstrating the challenged jury instruction did not have such an effect. *Libby*, 19 F.3d at 739. I believe he has met this burden.

■ The record shows that there were no eyewitnesses to Sgt. Halloran's killing who testified at petitioner's trial. Although there were some witnesses who saw the crime scene immediately after the killing, none of them were able to identify petitioner. The evidence made it clear that Sgt. Halloran had been killed by a gunshot to the chest, and that his killer had fled immediately afterwards, leaving Halloran to die. Moreover, witnesses testified hearing four gunshots coming from the crime scene, with a pause

7. The dissent in both *Libby* and *Anderson* would have adopted the standard for reviewing the effects of *Sandstrom* errors suggested in Justice Scalia's concurrence in *Carella v. California*, 491 U.S. 263, 267–273, 109 S.Ct. 2419, 2421–2424, 105 L.Ed.2d 218 (1989). Under that test, a jury instruction establishing a conclusive presumption is reversible error unless (1) the presumption was on a charge for which the defendant was acquitted, (2) the presumption related to an element of the crime which the defendant admitted, or (3) the predicate facts are so closely related to the ultimate fact implied by the presumption that no rational jury could find the predicate facts without also finding the presumed facts.

I believe that this standard has much to recommend it, recognizing as it does the centrally important role of proper jury instructions in insuring to the accused his Sixth Amendment right to be tried by a jury. Nonetheless, the First Circuit has held, on two separate occasions, that *Brecht v. Abrahamson*, rather than the *Carella* concurrence, provides the rule of decision here, and I am bound to follow this teaching.

between the first and the three later ones. Since Sgt. Halloran's gun was not discharged, this strongly suggests that the killer fired at Halloran multiple times, pausing in between. The evidence also showed that two different guns were fired and that .25 caliber and .38 caliber bullets were retrieved from the crime scene. These bullets matched a gun owned by petitioner's father, a police officer, and a gun which was later found hidden behind a panel in petitioner's house. A police expert testified that the second gun required its user to manually pull back the slide in order to discharge it. Moreover, a piece of broken plastic was found at the crime scene which was consistent with plastic missing from a damaged portion of petitioner's car.

Thus the evidence of petitioner's guilt is substantial. Most importantly for the purposes of this case, there is strong evidence that, whoever did the killing, it was done with premeditation and with malice aforethought. This evidence includes the fact that multiple shots were fired at Sgt. Halloran, and two different guns were used, including a gun requiring the shooter to manually pull back the slide. Moreover, none of the evidence which petitioner presented at trial, which focused on his alibi that he was at home at the time of the murders, cast the slightest doubt on the evidence of premeditation and malice as described above.

The judge's jury instruction in this case was in error because it directed, rather than permitted, the jury to infer the necessary intent (here premeditation and malice) for a finding of first degree murder. But as the foregoing discussion illustrates, such a finding was really never at issue at petitioner's trial, and the evidence supporting the finding was substantial and unrebutted. Once the jury decided that petitioner was the person who shot Sgt. Halloran, the verdict was a foregone conclusion. I am thus unable to conclude that the erroneous instruction had a "had a substantial and injurious effect or influence in determining the jury's verdict." *Anderson*, 23 F.3d at 597.

## III. PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM (CLAIM F)

Petitioner next claims that he was denied effective assistance of counsel, in violation of the Sixth Amendment of the United States Constitution. In essence, petitioner contends that trial counsel erred by presenting an alibi defense, and by failing to try the case on a theory of self-defense, whereby petitioner would have testified in his own defense.

To make out a claim for ineffective assistance of counsel, petitioner must show (1) deficient performance of counsel and (2) prejudice from that performance. *Lockhart v. Fretwell*, 506 U.S. 364, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). The petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To put it another way, counsel is ineffective only where his "unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986). I cannot find such error here.

Petitioner claims that, had he been allowed to take the stand, he would have testified as follows[8]: On the night of the murder, petitioner and his friend Mike were planning to rob the BP gas station in East Boston. Prior to their planned rendezvous, petitioner spent much of the evening drinking. After searching for Mike in vain, petitioner went to the house of his father, a policeman, and took his father's gun, inadvertently loading it with the wrong type of ammunition. Later that evening, he met Mike who told him, without explanation, that the plan to rob the gas station was off. They had a few drinks at a nightclub, and then Mike asked petitioner to hold his gun for a while. Petitioner agreed and placed Mike's gun in the trunk of his car.

---

**8.** Petitioner, as part of his new trial motion, submitted a handwritten statement which he contends is an accurate account of what he told his attorney prior to trial. The following chronology is taken from that statement.

Next, petitioner went to another club where he consumed more drinks, and stayed until closing time. Between 2:30 am and 3:00 am, petitioner left the club. He made abortive plans to rob the BP gas station on his own, but then changed his mind. After filling up with gas, he headed home. On his way, he passed Sgt. Halloran, whom he knew, and flashed his lights. Sgt. Halloran requested petitioner to pull over and to answer some questions. Sgt. Halloran started asking him about allegations that he had robbed people by impersonating a police officer, and inquired whether he had been covering up the license plate on his car. Petitioner told Halloran that it was none of his business, and pushed him away. Sgt. Halloran then pushed petitioner against the car, unsnapped his holster, and told him to open the trunk. After seeing what was in the trunk (i.e. the gun), Sgt. Halloran reached inside but petitioner pushed him back. Sgt. Halloran began to reach for his revolver and petitioner pulled out his father's gun and shot, "but nothing happened." Then petitioner started to head for the door of his car, and Sgt. Halloran stated, "It's not worth the trouble." Petitioner responded "fuck you" which caused Sgt. Halloran to raise his gun. Petitioner then shot at Sgt. Halloran and started to drive away. He stopped a few feet later, got out of the car, and did not see Sgt. Halloran anymore. He saw a passerby approaching, so he left the scene.

If, as petitioner asserts, this is the story he told his attorney prior to trial, I conclude not only that counsel's use of an alibi defense was reasonable, but indeed, it may well be more reasonable than the alternative the petitioner now proposes.

The most glaring problem with petitioner's self-defense theory is that his own proffered testimony undermines it. In order to show that he acted in self-defense, petitioner would have had to have shown that "he had reasonable ground to believe, and actually did believe, that he was in imminent danger of death or serious bodily harm." *Commonwealth v. Carrion,* 407 Mass. 263, 268, 552 N.E.2d 558 (1990). Moreover, self-defense is generally not available to one who initiates the affray. *Commonwealth v. Bellamy,* 391 Mass. 511, 515, 461 N.E.2d 1215 (1984); *Carrion,* 407 Mass. at 268, 552 N.E.2d 558;

*Commonwealth v. Johnson,* 379 Mass. 177, 180–181, 396 N.E.2d 974 (1979). Neither is it available when the defendant had a reasonable means of escape without the use of deadly force. *Bellamy,* 391 Mass. at 515, 461 N.E.2d 1215. Petitioner loses on all of these counts.

Petitioner admits that he initiated physical contact with Sgt. Halloran by repeatedly shoving him in response to his lawful requests. Petitioner also admits that at the time of his first attempt to shoot Sgt. Halloran, the Sergeant had not even removed his revolver from its holster, potentially undermining any claim he might have made of fear of death or serious bodily harm. When Sgt. Halloran finally did remove his gun (in obvious response to petitioner's attempt to shoot him), petitioner "got nerve (sic)" and shot at him again, this time successfully, as petitioner was entering his car door. This last incident suggests that petitioner had the opportunity to flee, but gratuitously shot at the officer anyway.

Further undermining any attempted use of a self-defense theory was the inconsistent statement which petitioner gave to the police at the time of his arrest. Petitioner told the police that he had returned home at 2:20 am on the night of the shooting, and had only heard about it on the police radio. Thus any attempt by petitioner to present his story of self-defense would have shown him to have lied to the police.

Finally, since there were no eyewitnesses to the shooting, and no positive identification of him as the person seen at the crime scene, the alibi defense chosen by petitioner would appear to have been much more plausible than the alternative he suggests. In sum, I am unable to conclude that the strategic choices made by petitioner's trial counsel represented "ineffective assistance" as a matter of law.

## IV. CONCLUSION

For the forgoing reasons, the petition for writ of habeas corpus is **DENIED**.

**SO ORDERED.**