USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 

No. 97-1715

 JEFFREY SINNOTT,
 
 Petitioner,
 
 v.
 
 RONALD DUVAL,
 
 Respondent.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Robert E. Keeton, U.S. District Judge]
 

 Before
 
 Boudin, Circuit Judge,
 Coffin, Senior Circuit Judge,
and Shadur, Senior District Judge.

 Max D. Stern for petitioner.
 William J. Meade, Assistant Attorney General, Criminal
Bureau, with whom Scott Harshbarger, Attorney General, was on
brief for respondent.

March 17, 1998

 COFFIN, Senior Circuit Judge. In this appeal from a district
court denial of a petition for habeas corpus, brought under 28
U.S.C. 2254, petitioner Jeffrey Sinnott seeks to set aside his
1987 conviction for first degree murder based on "extreme atrocity
and cruelty." He was indicted in 1983, along with a co-defendant,
Gary E. Mosso, for the murder of Anthony Tamburro, and found
guilty by a Massachusetts Superior Court jury in 1984, the judgment
being affirmed by the Massachusetts Supreme Judicial Court in
Commonwealth v. Sinnott, 399 Mass. 863, 507 N.E.2d 699 (1987). 
After post-conviction proceedings were resolved against him, he
initiated this action in the district court for the District of
Massachusetts.
 Two asserted trial errors are before us: (I) introduction into
evidence of a written statement of the non-testifying co-defendant,
Mosso, in violation of Bruton v. United States, 391 U.S. 123
(1968); and (II) certain jury instructions concerning malice,
alleged to have improperly reduced the Commonwealth's burden of
proof. As to each, the question we address is whether any error
had a substantial and injurious effect or influence on the jury's
determinations. See Brecht v. Abrahamson, 507 U.S. 619, 637
(1993). We have concluded that in each case the answer is "No." 
 I. Factual Background
 Our analysis will require detailed review of certain areas of
evidence, but we here sketch the general scenario to give context. 
This criminal prosecution stemmed from a fight in the early morning
of December 9, 1983 in a parking lot behind a nightclub in Oxford,
Massachusetts, Kastle's Keep, where the attractions were drinking,
dancing, and listening to a band, "The Fools." James Peloquin and
his friend, Anthony Tamburro, arrived at Kastle's Keep at 8:30 in
the evening of December 8, and at about 1:30 a.m. went to
Tamburro's car in the parking lot to get a demonstration tape of
another band. They encountered a group of three men, petitioner
and co-defendants Mosso and Blanchard.
 Conversation then took place with Tamburro concerning the
purchase of some cocaine. Soon Mosso purchased a half gram for
fifty dollars. Shortly thereafter, he complained about the quality
and wanted his money back. A fight started between Tamburro and
Mosso, and Tamburro fell or was thrown on the ground, where he was
repeatedly struck by Mosso. At this point petitioner intervened,
kicking Tamburro in the face. The extent of petitioner's continued
participation is the focus of much of the testimony. Suffice it to
say here that after only several minutes, Tamburro was rendered
inert and unconscious, suffering from abrasions, bruises,
lacerations, hemorrhaging and fractures, the injured areas ranging
from cranium to testes. Mosso and petitioner, in a car driven by
Blanchard, sped away from the scene as several persons summoned by
Peloquin came out from the Keep. Tamburro soon stopped breathing,
was administered oxygen, received CPR ministrations, and was taken
to a hospital where he was pronounced dead at about 2:52 a.m.
 II. The Bruton error
 The first error alleged by petitioner is the trial court's
admission of a written statement given the police by Mosso. 
Petitioner submitted his own written statement to police in which
he said that he had kicked Tamburro only once with the side of his
foot, then had stepped aside, trying to keep others from
interfering. Meanwhile, Tamburro was getting "beat bad" by Mosso. 
Mosso's statement represented petitioner as jumping in, early in
the fray, and repeatedly kicking for several minutes while he,
Mosso, was trying to persuade him to withdraw. Mosso ascribed all
injuries inflicted on Tamburro to petitioner. Neither petitioner
nor Mosso testified, and objection to admission of Mosso's
statement was properly made. 
A. Guidelines of Review
 While there was a misimpression of the admissibility of
Mosso's statement at the trial stage of this litigation, based on
no longer applicable caselaw, it is now undisputed that admission
of the incriminating statement violated the Confrontation Clause of the Sixth Amendment because petitioner was deprived of the
opportunity of cross examination. See Bruton, 391 U.S. at 137. 
 The Supreme Court has made it clear that on collateral review
of habeas cases involving trial error, the test for harmless error
is not so rigorous as that demanded by Chapman v. California, 386
U.S. 18, 24 (1967) (where the prosecution must establish
harmlessness beyond a reasonable doubt), but follows the standard
enunciated in Kotteakos v. United States, 328 U.S. 750, 776 (1946):
did the error have "substantial and injurious effect or influence
in determining the jury's verdict"? Brecht, 507 U.S. at 631, 637. 
 In arriving at this conclusion, the Court observed that a
constitutional violation occurring during presentation of the case
to the jury is amenable to harmless-error analysis because it "'may
. . . be quantitatively assessed in the context of other evidence
presented in order to determine [the effect it had on the trial].'"
Id. at 629 (citing Arizona v. Fulminante, 499 U.S. 279, 307-308
(1991)). While the Court determined that habeas relief should not
be granted based on merely a "reasonable possibility" that the
error contributed to the verdict, id. at 637, it also recognized
that relief should not be denied simply because a reviewing court
felt that a petitioner "would have been convicted even if the
constitutional error had not taken place." Id. at 642 (concurring
opinion of Justice Stevens, who cast the deciding vote). As we
said in Gilday v. Callahan, 59 F.3d 257, 269 (1st Cir. 1995),
 [W]e . . . must consider -- to restate the Brechtstandard -- whether the error was of such magnitude that
 it actually casts doubt on the integrity of the verdict. 
 This is the difference between a possibility and a
 probability. 
Moreover, our review is plenary and the burden of establishing
harmlessness is on the prosecution. O'Neal v. McAninch, 513 U.S.
432, 436 (1995).
 We derive some additional guidance for our review from
Kotteakos itself. We are told that errors "conceivably may be
altogether harmless in the face of other clear evidence, although
the same error might turn scales otherwise level." 328 U.S. at
763. A court must have "the conviction . . . that the error did
not influence the jury, or had but very slight effect. . . ." Id.at 764. The Court's careful comparative weighing to distinguish a
case in which the same error resulted in a reversal, Berger v.
United States, 295 U.S. 78 (1935), see 328 U.S. at 766-774, informs
our own analysis of the likely impact of the offending evidence.
 B. The Evidence
 The question we must consider, therefore, is whether admission
of Mosso's statement implicating petitioner as the primary
combatant had such a "substantial and injurious effect or
influence" that it "casts doubt on the integrity of the verdict." 
Central to this issue is the evidence concerning the extent and
nature of petitioner's involvement in the fracas and his state of
mind. We shall examine in detail the relevant testimony of four
non-party eyewitnesses, that of the pathologist who conducted the
autopsy, written statements given the police by both petitioner and
Mosso, and the closing argument of the prosecutor, who commented on
the two defendants' statements. We shall then assess the likely
impact of the admission and use of the Mosso statement.
 (1) Eyewitness Testimony. We begin by identifying the crucial
and relevant testimony of each of the four non-party witnesses as
to the participation of petitioner in the beating of Tamburro. It
is clear that the full import of the testimony cannot be adequately
conveyed by merely listing the varying number of blows or kicks
that each witness saw petitioner inflict. For not only did the
witnesses observe for different periods of time, but the
surrounding circumstances also add relevant detail. And since our
task is to gauge the probability of Mosso's statement having had a
substantial effect on the jury's deliberations, we strive to have
as complete a picture in mind as did the jury.
 James Peloquin was the first witness. A good friend of the
victim, he was on the scene at the very beginning and remained
until very nearly the end. From 8:30 p.m. until 1:30 a.m. he had
only three alcoholic drinks. These are the major points he made:
 -- After Mosso complained of the quality of the cocaine
Tamburro had sold him, he demanded a sample of Tamburro's personal
supply and was offered a "taste." He accused Tamburro of not
trusting him, and then took off his jacket. Petitioner took off
his own jacket, saying, "So it is going to be one of those."
 -- Mosso then hit Tamburro in the face, Tamburro struck back,
hitting him lightly, the two wrestled, and Tamburro tripped and
fell with Mosso on top of him. Mosso pinned Tamburro's left arm
and head, and elbowed him in the eye five or six times.
 -- As Tamburro was wriggling, trying to free himself, Peloquin
started over but was hit on the back of the head by petitioner and
fell down as a result.
 -- Petitioner then approached Tamburro and, as he was trying
to get up, his hands behind his back in a lifting position,
petitioner kicked Tamburro in the face "right square," the front of
his ankle hitting the left side of the bridge of Tamburro's nose.
 -- Tamburro fell on his back again, legs to one side. Mosso,
standing at Tamburro's feet, started kicking him in the lower
abdomen, and petitioner, standing above the upper part of his body,
"was still kicking Tony" around the face. Peloquin could not say
how many times either man struck Tamburro. During this time,
Tamburro was apparently helpless, doing nothing. 
 -- Peloquin then grabbed Tamburro with a bear hug from the
rear and dragged him several feet away. He was being hit by both
Mosso and petitioner, and then petitioner kicked him in the ribs. 
Peloquin dropped Tamburro and headed toward the nightclub. Before
entering the club to obtain help, he looked around and saw
petitioner give one final blow to Tamburro's head. Peloquin
acknowledged on cross-examination that he had given four separate
statements to the police, all of which varied some in detail. When
asked if he had given a statement in which he had said that he did
not remember who administered the last kick, Peloquin replied that
what he had said on the stand was his best memory.
 -- Asked about petitioner's sobriety, Peloquin said he seemed
very drunk, and was swaying and slurring his words. He did not
recall his staggering or messy clothes, but said that counsel's
description of petitioner as "falling down drunk" was a fair
statement.
 Stephen Amaral, who did not know Tamburro, had come to
Kastle's Keep with his friend Ducharme. He had consumed many beers
and White Russians (kahlua, vodka and milk) and described himself
as very drunk by the time he arrived at the nightclub, at about
12:30 a.m. The two left at approximately 1:45 a.m. These were
Amaral's observations about the fighting:
 -- From the passenger seat of Ducharme's pickup truck, he saw
two men going down on the ground, the smaller one on the bottom,
the larger one on top. The larger man was facing the feet of the
smaller one and punched him in the groin three times. Amaral
looked away to talk to Ducharme. When he looked back, the smaller
man was on the ground, his back leaning against a car. The larger
man, whom he observed to have dark hair, kicked him twice in the
head.
 -- Then another person, a blonde man, was on the left of the
reclining man; he and the larger man then each kicked the victim in
the head twice. "They kicked him as if you were going to kick a
football on a kickoff or something." 
 -- The victim then stood up, ran about ten feet, and fell down
on his back. Then "[t]he kid with blonde hair went over to him and
halfheartedly kicked the side of his face, turning his head from
one side to the other." The dark-haired assailant approached the
victim and appeared to be checking his pulse. As a group from the
nightclub came running toward them, the two men got in a car and
took off.
 Gary Ducharme had drunk only two beers in two hours. When he
and Amaral left Kastle's Keep, Ducharme was to drive. He testified
that Amaral did not appear "to be bad to me at all," but could not
be sure of his condition. Ducharme's relevant testimony follows:
 -- He was trying to fix the car radio when Amaral called his
attention to a fist fight between two men, one about eight inches
taller than the other. The two fell, the larger one on top and
facing the other's feet; he punched his opponent in the groin three
times. The smaller man was on the ground, tried to push himself
up, but was kicked in the face two or three times.
 -- At this point Ducharme observed "the other taller kid
going in and kicking him also." This person, a blonde haired man,
kicked the prone man in the face, alternating with the other man,
kicking him "once or twice." The other man also kicked once or
twice.
 Douglas Cassidy had gone to the same high school as Tamburro,
but the two were not friends. He had consumed approximately six to
eight drinks from 9:30 p.m. to 1:30 a.m. Although "having a good
time," he described himself as "quite aware." When he and his
friends prepared to leave, he observed:
 -- Two persons were standing beside another, who lay face up
on the ground, and were kicking him. The blonde haired person was
on the left and kicked the prone individual "a number of times" in
"the upper body, head area." The other man also kicked a number of
times in the same area.
 -- Cassidy then ran over and said to petitioner, "You're a
loser." He raised the victim to a sitting position, and the two
men who had kicked him took off in a car. 
 (2) The Co-defendants' Statements. In addition to this
testimony from non-party witnesses, a written statement from each
defendant was admitted into evidence. Petitioner's statement was
in the form of an interview with a state trooper and included the
following points:
 -- After Mosso purchased the cocaine from a man petitioner
described as shorter than himself, Mosso tried it. Shortly
thereafter, petitioner got out of the car and saw Mosso and the
other man fighting. 
 -- Petitioner then got out of the car, ran over, and gave
Tamburro a side kick in the ribs. Tamburro went down, got up
again, and continued fighting.
 -- Petitioner "kept other people from jumping into the fight."
 -- The "kid" was "getting beat bad . . . . Gary (Mosso) kept
kicking the kid after he was down. I think he went nuts."
 -- That night, petitioner was wearing black combat boots.
 Mosso's statement contained these remarks:
 -- The dispute was over the quality of the half gram of
cocaine that Mosso had bought for $50. Mosso complained and wanted
his money back. The "kid," about 5 feet eight or nine inches tall,
refused, grabbed Mosso by the chest, and hit him in the forehead. 
The two wrestled to the ground, punching at each other. When Mosso
tried to get up, the kid grabbed his right leg by the ankle; Mosso
started kicking to get loose and managed to free his leg.
 -- At this point, petitioner jumped out of the car and started
kicking the kid, kicking him a few times in the face and shoulder
area.
 -- Mosso told petitioner, "Forget it, cut it out, let's get
out of here." Although Mosso went back to their car, petitioner
stayed and continued to kick the kid for three minutes.
 -- Mosso did not think he "caught [the kid] with any punches
at all," and believed that the kid was not hurt by him, but "was
hurt bad after Jeff [petitioner] got through kicking him." 
 (3) The Medical Testimony. Dr. Sussman, Chief of Pathology of
the Worcester City Hospital, conducted an autopsy, had photographs
taken, and testified at length. In very summary fashion, these
were his observations and conclusions:
 -- External injuries included multiple abrasions, lacerations,
and bruises on the head, face, and both ears, and abrasions on both
cheeks; a crepitant nose, with a bubbly feeling; a swollen and
hemorrhaging upper lip; abrasions on right and side portions of the
back; multiple abrasions on right upper, left side, and front of
chest; abrasions on top of the left shoulder; abrasions on knee;
and a tear in one thumb.
 -- Internal injuries included the brain, which was swollen
and had moved from normal position to compress the pons medulla
(responsible for controlling respiration and heart beat); the
scalp, which experienced hemorrhaging on the left side, near the
ear; the larynx and trachea, which contained blood and stomach
contents; two fractured ribs, with underlying contusions to the
lungs and associated bleeding; the abdominal wall and large
intestine, which were hemorrhaging; a bruised spinal cord and
hemorrhaging adjacent to the spine; hemorrhaging also seen in and
around testicles.
 -- All injuries were consistent with kicks except those to the
testes, which were more consistent with blows from a fist or elbow.
 -- Death was caused by "multiple blunt trauma," there being at
least twelve injuries: at least two on the chest, five on the face,
one on the back of the neck, one on the hand, one on the shoulder,
one on the back, and one in the testes. The most likely cause of
death lay in traumas to the head, although the injuries to the
chest, neck, testes, and abdomen could have contributed.
 (4) The Prosecutor's Closing Argument. Petitioner claims that
the prosecutor's closing argument, although not evidence, "enhanced
and fortified" the Bruton error by comparing and contrasting the
two defendants' statements "with dramatic oral and visual
fingerpointing." Here are the salient portions:
 If you believe everything that [defendants' counsel] said
 on behalf of their respective clients, . . . then Mr.
 Mosso, at least, and Mr. Sinnott, didn't do anything, and
 Mr. Tamburro is really not dead. Because if you listen
 exclusively to Mr. Sinnott and Mr. Mosso, neither one of
 them hurt [Tamburro]. If you listen to both of them, what
 have they done with respect to this trial . . . all the
 way up to today in the final argument, when both of them
 in effect went like this (illustrating by crisscrossing
 one hand over the other and pointing index finger) "I'm
 not responsible."

 . . . 

 Well, I would submit to you, ladies and gentlemen,
 that based on all the evidence that you have heard from
 all the other witnesses, that both Mr. Mosso and Mr.
 Sinnott were making self-serving statements. They both
 didn't tell the complete truth. They both told the
 police what they wanted to convince the police what
 happened. "Look, I was involved, but I am really not the
 one who is guilty here. It is him."
C. Our Assessment Absent the Mosso Statement
 In Levasseur v. Pepe, 70 F.3d 187, 193 (1st Cir. 1995), we
identified three factors that are relevant to determining if the
jury was "substantially swayed" by offending evidence: "(1) the
extent to which the error permeated the proceeding, (2) the
centrality of the issue affected by the error to the case as
actually tried and (3) the relative strength of the properly
admitted evidence of guilt." In this case, there is no question
that the issues to which the Mosso statement is most relevant --
petitioner's mental states and degree of atrocity -- are central. 
We shall discuss the first factor, prevalence, when we consider the
impact of the statement in the next section. In this section, we
deal with perhaps the major test of harmlessness -- the relative
strengths of the cases for the prosecution and the defense absent
the offending evidence.
 We first sort out the extent of agreement or disagreement in,
and the nature of, the non-party eyewitness testimony so that we
can assess its general force and weight. We then evaluate the
medical evidence. Finally, we consider the potency of the
petitioner's case.
 Although the evidence shows that each of the eyewitnesses had
consumed some alcohol on the night in question, there is little
basis for challenging the sobriety of two them -- Peloquin and
Ducharme, neither of whom had had much to drink. Cassidy was
"feeling good," but his claim of being aware is consistent with the
span of time over which he had consumed his drinks. Only Amaral
admitted to being drunk, with some justification based on his
record of consumption. As for opportunity to observe, Peloquin,
significantly, was on the scene from the beginning to almost the
end, and both Amaral and Ducharme were present for critical parts
of the fight. Cassidy was on the scene for the final act.
 Most of the evidence, and all of it concerning the core
evidence of kicking, was remarkably consistent and corroborative. 
Although not evidence contributed by the eyewitnesses, petitioner's
own statement that he was wearing black combat boots at the time
establishes this notable fact. The consensus narrative began with
the inception of the fight between Tamburro and Mosso, their
wrestling, and falling to the ground.
 Peloquin saw Mosso elbowing Tamburro in his eye five or six
times. Amaral and Ducharme saw him punching Tamburro in the groin
three times. We know from the medical testimony that the testes
were injured. In either event, Tamburro at this juncture was
supine and helpless. Then came petitioner's entry into the affray,
kicking Tamburro. Peloquin is the only non-party witness to a
specific first kick, but petitioner in his statement confirmed this
fact, differing only in that he said it was a side kick in the
ribs, not a side kick to the bridge of the nose. 
 Then came the period of joint kicking by both petitioner and
Mosso, one on either side of Tamburro, the smallest of the three. 
The quantitative estimates do not dramatically vary: Peloquin
refers to petitioner as "still kicking" around the face although he
could not give a number of times either man kicked; Amaral said
both men kicked Tamburro in the head twice, much in the manner of
kicking a football at kickoff; Ducharme described both men as
"alternating" in their kicking "once or twice"; and Cassidy
described both men as kicking "a number of times" in "the upper
body, head area."
 Finally, there was substantial consensus, and no
contradiction, as to a final kick by petitioner. Peloquin's best
memory was that it was petitioner who administered the final blow. 
Amaral described it as a half-hearted kick, turning Tamburro's head
from one side to the other. And Cassidy, while not identifying a
single final blow, was sufficiently moved by what he saw to rush
toward petitioner and say, "You're a loser."
 Not corroborated by other witnesses, but in no way
contradicted, was Peloquin's testimony that, at the very outset,
petitioner not only removed his jacket along with Mosso, but made
the statement, "So it is going to be one of those"; that, as
Tamburro was wriggling to escape Mosso's elbowing in his eye,
petitioner hit Peloquin on the back of his head as he started to
intervene; and that, again, when Peloquin was trying to drag
Tamburro to safety, petitioner kicked him in the ribs, causing him
to drop Tamburro. Subsequent medical examination at St. Vincent's
Hospital corroborated this testimony, revealing contusions in
Peloquin's rib areas.
 To this testimony must be added the findings of a pathologist
reviewing his autopsy of Tamburro: at least twelve separate
injuries, comprising abrasions, bruises, lacerations, swellings,
discolorations, hemorrhaging, fractures to the head, chest,
abdomen, neck, spine, and other vital parts. 
 All this presents a cohesive, consistent picture of an affray
pitting two larger men against a smaller one, with Mosso initiating
and petitioner intervening after the smaller man, on the ground and
on his back, had suffered a series of hard blows to his eyes and/or
testicles, then the two continuing to kick, with petitioner staying
in to the end. The injuries were multiple and serious from testes
to cranium, and inflicted largely through the medium of violent
kicks with, at least in petitioner's case, heavy boots; so many
discrete injuries occurred in so many parts of the victim's body
that they could not have been produced by only a few kicks or
blows. Moreover, the short time span of the affair argues for more
than one participant. Perhaps even more persuasive of continued
dual participation is the extent to which injuries were observed to
both ears, both cheeks, and both sides of the victim's chest,
indicating more than one assailant.
 To borrow the language of the Court in Brecht, "the State's
evidence of guilt was, if not overwhelming, certainly weighty." 
507 U.S. at 639.
 Against this evidence, petitioner's case is not impressive. 
His claim that all the eyewitnesses had been drinking overlooks the
different amounts of alcohol consumed and the time span of
consumption, indicating that only Amaral could be said to be drunk. 
As for the minor differences in the numbers of kicks observed, the
witnesses' total testimony, as we have seen, was remarkably
internally consistent for a violent, short-lived fracas, observed
in the early morning hours by four people at slightly different
times from different vantage points. Moreover, it is likely that
petitioner's own statement hurt rather than helped him. That he
would have rushed in after Mosso had Tamburro on the ground and
kicked him in the ribs, then suddenly have withdrawn and merely
tried to keep other people from jumping into the fight while Mosso
was going "nuts" and beating Tamburro, seems counter intuitive.
 After our minute review of all the evidence, quantitative and
qualitative, from eyewitnesses and the pathologist, as well as from
petitioner, we conclude that, absent Mosso's statement, the
evidence was far from being in equipoise, but rather was
impressively cogent on the part of the prosecution, any chipping
away as the result of vigorous cross examination being canceled out
by the unlikely persuasiveness of petitioner's version.
 D. Likely Impact of the Mosso Statement 
 Petitioner argues that the extent of his participation in the
beating was critical to two issues: whether he exhibited malice,
which is a prerequisite to a finding of even second degree murder
(requiring an intent to kill, an intent to do grievous bodily harm,
or circumstances that would have led a reasonably prudent person to
believe there was a plain and strong likelihood of death), and
whether the killing was marked by "extreme atrocity and cruelty,"
one of the two bases for a first-degree murder finding (the jury
having explicitly ruled out the alternative basis, premeditation). 
Petitioner argues that Mosso's statement "tilted the balance of the
evidence," corroborating the testimony of Peloquin and Cassidy, who
testified to more extensive involvement on his part than did Amaral
and Ducharme.
 As we have just concluded, we see no initial "balance" to be
tilted. But assuming we are wrong in our assessment, what impact
was likely from Mosso's statement? When we juxtapose Mosso's
account against this critical body of evidence, we assess the
likely effect as follows. Mosso's description of the beginning of
the episode, ending with both him and Tamburro on the ground, adds
nothing to other accounts except the highly unlikely detail that
Tamburro, the smaller man who was content to let the transaction
stand, started the fight. 
 Mosso's statement about petitioner's intervention and kicking
Tamburro adds little to petitioner's own admission. It departs
from petitioner's version by going beyond a single kick to a few
kicks in the face and shoulder area. This observation concededly
paralleled the testimony of Peloquin and Cassidy. If the number of
kicks were the only important fact, and if Mosso's statement
possessed earmarks of credibility, this might be a closer case.
 But not only did the testimony of all four eyewitnesses point
to a brutal boot-kicking of a defenseless, felled person in the
head and upper body, inflicting multiple injuries, but Mosso's
statement also had to have fared poorly in the jury's minds. In
the first place, Mosso already had demonstrated his ability to
fabricate, with a first statement in which he denied knowledge of
Tamburro or any fight. Even more important, however, was the
balance of the statement, in which Mosso portrayed himself as
leaving the fray, asking petitioner to desist, and sitting in the
car while petitioner continued kicking Tamburro for three minutes. 
This version not only contradicted all the eyewitnesses but also
was inherently implausible. After all, it was Mosso who had paid
the fifty dollars and was the initial fight participant. His
further statement that he did not think he had inflicted any
damage, and that all of the injuries had to be caused by his co-
defendant, could not have affected the jury in any manner adverse
to petitioner.
 We therefore conclude that no reasonable jury could have been
influenced in its determinations, not to mention substantially
influenced, by Mosso's statement. We have been pointed to no place
in the trial where it played a role except in the prosecutor's
closing argument, a subject to which we now turn. Petitioner's
claim is that, by coupling petitioner and his co-defendant with
their reciprocal finger-pointing statements accusing the other, the
prosecutor effectively canceled out petitioner's statement.
 If the closing argument's use of the Mosso statement were both
the dominant motif and the source of significant prejudice that
otherwise would not have existed, the "prevalence" factor might be
satisfied and perhaps the previous imbalance of evidence might be
overcome.
 But such is not the case here. In the first place, we note
that petitioner is now asking us to ride two horses, going in
opposite directions. On the one hand, petitioner asserts that the
prosecutor's use of the Mosso statement "increased the likelihood
the jury viewed Sinnott's participation as greater than it was." 
On the other hand, he also asserts that the evil lies in the
prosecutor's deft claim that each was pointing the finger at the
other, and thus Mosso's statement improperly canceled out that of
petitioner. It is difficult to see how the Mosso statement could
at the same time add to the weight of the state's case and also be
dismissed as another transparent attempt to shift blame.
 Nevertheless, even though the finger-pointing argument was not
made at trial or before the state court, we shall, like the
district court, consider it. In homage to a search for prevalence,
we note that in the course of an eleven-day trial, occupying 1,389
pages of transcript, the prosecutor's challenged remarks occupied
at most four pages, one at the very beginning of his 37-page
argument and three two-thirds of the way through. The significant
fact is that the predominant part of the prosecutor's closing
rested on the evidence, not the statements of the defendants. 
 More to the point is that the basic message conveyed by the
prosecutor could and undoubtedly would have been conveyed had there
been no Mosso statement, namely, that petitioner was obviously
trying to shift blame. When counsel argues that, by showing that
another defendant succumbed to the instinct of self preservation,
the prosecutor unfairly demeaned petitioner, we cannot quite see
the logic. But perhaps, apart from logic, there was some impact
from the prosecutor's dramatic ploy of crossing his hands with
fingers pointing. All we can say as to this is that at the very
most any additional effect on the jury's deliberations was
"slight."
 We are convinced from our meticulous review of this trial that
the admission of the Mosso statement and the use made of it by the
prosecutor in his closing argument did not in all probability have
a substantial and injurious effect or influence on the
determinations of the jury. 
 III. The Instructions on Malice 
 Petitioner has advanced four claims of error in the trial
court's jury instructions. None was made at trial. The
Massachusetts Supreme Judicial Court and the district court have
considered them at considerable length and found no merit. At this
juncture, we see no point in addressing issues of exhaustion, other
procedural problems, or even the correctness vel non of the several
instructions. Just as was the case with the Bruton error we have
discussed, the substantive question is whether, in this collateral
consideration of the record as a whole, any errors, singly or
collectively, have been demonstrated by the Commonwealth as having
had no substantial and injurious effect or influence in determining
the jury's verdict. Libby v. Duval, 19 F.3d 733, 738-40 (1st Cir.
1994) (applying Brecht harmless error review to error in giving
mandatory presumption instruction).
 Petitioner's underlying theme is that the instructions failed
in various ways to satisfy Massachusetts case law on how to charge
malice, a state of mind that is a prerequisite for finding either
first or second degree murder. Massachusetts cases establish that
malice can be proven in one of three ways: (1) showing that the
defendant, without justification or excuse, possessed an intent to
kill, (2) showing that the defendant, without justification or
excuse, possessed an intent to cause grievous bodily harm, or (3)
showing circumstances in which a reasonably prudent person would
have known there was a plain and strong likelihood that death or
grievous bodily harm would result. See, e.g., Commonwealth v.
Grey, 399 Mass. 469, 470 n.1, 505 N.E.2d 171, 173 n.1 (1987);
Commonwealth v. Huot, 380 Mass. 403, 408, 403 N.E.2d 411, 414
(1980). Although the trial court discussed malice at considerable
length, it did not list the three alternatives as such.
 As might well be expected in a criminal prosecution of three
defendants charged with the most serious offenses, the court's
instructions were lengthy, encompassing forty pages of transcript. 
Those relevant to the claims at issue occupied some fifteen pages. 
Petitioner's claims are based on passages appearing on three of
these pages. Our task is to view these statements in the context
of a complicated and lengthy set of instructions and to assess the
extent to which they would likely have affected the jury's thought
processes.
 We discuss first an instruction that petitioner describes as
"automatically equating use of a deadly weapon with malice." The
court said:
 A killing may be malice, and consequently murder, even
 though the slayer did not wish to cause death. If a man
 intentionally and without legal justification uses upon
 the body of another a deadly weapon, such as a gun or a
 knife, and death results, a jury may infer that malice
 aforethought is present.
Petitioner asserts that the court never explained that there must
be an intent to kill, or to do grievous bodily harm, or that a
prudent person would have known that he was creating a plain and
strong likelihood of death. 
 This assertion overlooks a number of other efforts by the
court to explain the kinds of actions that would be required to
reach the malice threshold. We mention three. The first came
several pages earlier than the above quoted passage and addressed
the definition of a dangerous weapon. Although the court was
discussing the charges against Blanchard, who was being prosecuted
as an accessory after the fact to the crime of assault and battery
by means of a dangerous weapon, it had to explain the offense of
the principals. It identified two kinds of dangerous weapons,
quoting from an unidentified case in describing the second type:
 One type is by design a dangerous weapon, guns, daggers,
 they are designed to do serious bodily injury to people
 . . . .

 "[Another type] may also be defined as an instrument . .
 . which, because of the manner in which it is used, or
 attempted to be used, endangers the life or inflicts
 great bodily harm, or is calculated as likely to produce
 death or serious bodily injury . . . ."
 
 It is for you to decide in this case whether as to a
 particular charge, an instrument such as a foot covering,
 was used in such a manner that in the particular
 circumstances of the case, it was a dangerous weapon. 
 With this discussion of a dangerous weapon and its use, the
court, a few pages after the passage first quoted, fleshes out
"malice aforethought" by stating that if the jury finds beyond a
reasonable doubt that an assault and battery by means of a
dangerous weapon has been committed, causing death, and 
 that the murder was the natural and probable consequence
 of the commission of the crime, and . . . that that
 crime, assault and battery by means of a dangerous
 weapon, is a crime that involved inherent danger to human
 life, then the fact of the commission of that crime, with
 death resulting, allows you to find the presence of
 malice aforethought from those facts. So that under
 those circumstances, you would have at least a murder in
 the second-degree. (Emphasis added.)
 From this overview of the instructions, it is clear, whether
required or not, that all three alternative ways of meeting the
malice requirement were discussed by the court. Petitioner himself
concedes that "the court instructed, according to the first prong
of malice, that malice may be found from an intent to kill." The
third prong, knowledge of a prudent person that his actions created
a plain and strong likelihood of death or grievous bodily harm, was
substantially covered by the court's references to using an
instrument in a way "calculated as likely to produce death or
serious bodily injury," to murder being "the natural and probable
consequence" of the use of the dangerous weapon, and to a crime
"that involved inherent danger to human life." Any difference
between these comments and the "plain and strong likelihood"
language of the cases is so slight as not to weigh significantly in
the scales of probable injurious effect.
 As for the second prong, intent to do grievous bodily harm,
the fact that the jury rendered a special finding of extreme
atrocity and cruelty excluded any possibility that the jury was
misled by the absence of a haec verba instruction. For the court,
in addressing the requisites of first degree murder, after saying
that more than ordinary atrocity or cruelty was needed, said:
 Repeated violent blows have been held to evince such
 ferocity as would warrant a finding of extreme atrocity
 or cruelty. 
The court added, quoting from a case:
 "Evidence that a defendant struck the fatal blow 'for
 kicks,'" using the colloquial expression. "A crime that
 was committed with such savagery and brutality, where
 there were repeated violent blows, which were held to
 evince a particular ferocity that would constitute
 extreme atrocity and cruelty.
 In our view, there is accordingly no likelihood that the jury
would have acted on the assumption that mere use, simpliciter, of
a deadly weapon, resulting in death, without the requisite intent
or knowledge of consequences, was a sufficient basis for its
conclusions. The same extracts from the instructions suffices to
dispose of two other claimed errors.
 Very similar to the first claim is the assertion that the
court erred in creating a mandatory presumption, in violation of
the teaching of Sandstrom v. Montana, 442 U.S. 510 (1979), by use
of the following language:
 If you have a death resulting under the circumstances I
 described by one who has committed a felony, an assault
 and battery by means of a dangerous weapon, then you have
 a murder in the second-degree.
This excerpt is found in the penultimate paragraph of the entire
charge and is clearly part of a thumbnail summary. It is
immediately preceded by a page listing the "circumstances" it
references; the jurors were instructed that to find malice
aforethought from the commission of the crime of assault and
battery by means of a dangerous weapon, they must conclude that the
crime is one in which "the natural and probable consequence" is
death and one which involves "inherent danger to human life."
 The language pinpointed by petitioner, suggesting a mandatory
presumption, seems to us effectively qualified and explained by the
earlier passage. See Hill v. Maloney, 927 F.2d 646, 649 (1st Cir.
1990). In any event, even if any error remains, there is in our
judgment no likelihood that it had any substantial influence upon
the jury's deliberations.
 The same analysis and conclusion apply to petitioner's third
claim of error, directed to this extract:
 There also, of course, can be actual malice. You can
 find there is ill will and there is hatred and harboring
 of a grudge, motives of revenge or punishment.
Petitioner claims that this instruction permitted the jury to find
malice "upon proof of a mere intent to injure," considerably
watering down the required intent or knowledge.
 Once again, a statement is taken out of context and without
regard to other qualifying instructions. In the first place, the
statement follows a reference to situations permitting the
inference of malice from use of a deadly weapon, and is part of a
systematic effort to limn the contours of malice without at that
point filling in details. In the second place, petitioner strains
the text in his effort to find error, going beyond the listed
examples which suggest mental states prior to the petitioner's
involvement in a fight -- ill will, hatred, a grudge, revenge,
punishment. Ordinarily one would not characterize an instantaneous
decision to step into a fight to help a friend as malice.
 But, even according "ill will" the meaning of "intent to
injure" urged by petitioner, the passages we have quoted above
adequately flesh out the kind of action that must accompany the
motive of ill will to meet the requirement of malice. Moreover, we
cannot imagine how a jury could arrive at a finding of extreme
atrocity and cruelty if it felt that petitioner harbored a mere
intent to injure, rather than at least an intent to cause grievous
bodily harm. This instruction, if not explained and cured by
context and other instructions, most certainly possessed no
likelihood of influencing the jury's deliberations.
 The final claim of error is that, contrary to Massachusetts
law, the jury was instructed that it might consider whether
defendant had an impaired capacity because of his consumption of
alcohol solely as to "first-degree murder, but not on any other
degree of offense." Petitioner cites Commonwealth v. Henson, 394
Mass. 584, 582, 476 N.E.2d 947 (1985), for the proposition that
voluntary intoxication is relevant to all three species of malice,
and thus to second-degree murder as well. The government responds
that, even if there were an error of state law, such is not a basis
for habeas corpus relief if there is no violation of the
Constitution, laws, or treaties of the United States, citing
Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), and it points out
that the defense of voluntary intoxication is not constitutionally
required. See Montana v. Egelhoff, 518 U.S. 37, 116 S. Ct. 2013,
2024 (1996); Robinson v. Ponte, 933 F.2d 101, 104-105 (1st Cir.
1991). We do not reject the government's argument, but prefer to
rest on what we think is dictated by the jury's decision.
 In the somewhat restrained review we conduct under the
dictates of Brecht, we have difficulty in understanding how, in
light of the court's lengthy instructions on alcohol-induced
impairment of mental capacity to engage knowingly in acts of
extreme atrocity or cruelty, one could argue that restricting such
instruction to first degree murder was prejudicial. After all,
there was no conviction as to any offense except first degree
murder by extreme atrocity or cruelty. As to this, the court went
beyond saying that the jury could consider defendant's mental and
emotional state in light of his alcohol consumption. It added:
 Let me be a little bit more precise regarding that. 
 If the jurors determine from the evidence that a
 defendant had substantially reduced mental capacity at
 the time that the murder or the crime was committed, they
 can consider the effect, if any, that the defendant's
 impaired capacity had on his ability to comprehend the
 consequences of his choices. Thus, a defendant's mental
 impairment is to be weighed in evaluating the evidence of
 the manner and means of inflicting death . . . .
 In light of the special verdict finding of extreme atrocity or
cruelty, pursuant to these instructions, we do not see how it was
possible for the absence of a voluntary intoxication instruction on
the issue of malice to have prejudiced petitioner. Although a
negative finding as to extreme atrocity or cruelty would not, under
the instructions, have barred a second degree murder conviction,
the finding of extreme atrocity, notwithstanding the evidence of
drunkenness, presupposed a determination of "ability to comprehend
the consequences of his choices." That the jury found first degree
murder in these circumstances eliminates the possibility that the
absence of instruction on second degree murder was prejudicial. In
sum, we discern no likelihood that this claimed error influenced
the jury's thought processes.
 Accordingly, our review of the instructions indicates no error
cognizable under habeas corpus strictures.
 AFFIRMED.